ROBERTS, J., for the Court.
¶ 1. H.K. filed a complaint against his former wife, T.K., for modification of custody of their then two-year-old daughter, S.K.[1] The Harrison County Chancery Court found merit to H.K’s complaint and awarded H.K. primary physical custody of S.K. T.K. appeals. Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. H.K. and T.K. were married in 2001. Their only daughter, S.K., was born in January 2003. H.K. and T.K. separated in April 2003, and nearly two years later, they divorced. At that time, they agreed that T.K. would receive primary physical custody of S.K. and that H.K. would receive visitation rights.
¶ 3. The parties had consistently lived on the Mississippi Gulf Coast. During H.K.’s visitation weekend before Hurricane Katrina made landfall on Monday, August 29, 2005, H.K. had taken S.K. to Tallahassee, Florida so she would not be in the path of the hurricane when it made landfall. Although H.K.’s visitation was scheduled to end on Sunday evening, H.K. did not return to the Mississippi Gulf Coast until the following Tuesday.
¶4. H.K. returned S.K. to T.K.’s custody. At that time, T.K. did not have electricity, food, or water. H.K. asked T.K. to let S.K. remain with him because he had a generator that was able to supply electricity to his entire house and his living arrangements were relatively unaltered by the storm damage. T.K. refused H.K’s request. During the next four days, T.K. went to H.K.’s discount beer and tobacco store twice.[2] Each time, T.K. was allowed to take what she needed from the store.
¶ 5. During T.K.’s second trip to the store, S.K. remained in T.K.’s car with an unidentified woman. According to H.K., S.K. was dirty; she had rashes; and she suffered from numerous insect bites. H.K. *1059 again unsuccessfully asked T.K. to leave S.K. with him.
¶ 6. Without informing H.K., T.K. took S.K. to Phenix City, Alabama. H.K. attempted to call T.K., but she would not answer his calls or return his messages. H.K. did not see S.K. or communicate with T.K. for approximately two months.
¶ 7. On November 9, 2005, T.K. filed a form petition for protection from abuse against H.K. in the circuit court of Russell County, Alabama. Within the form petition, T.K. described herself as a resident of Russell County, Alabama. T.K. checked boxes and claimed that: H.K. had injured her; he had tried to injure her; he had threatened to injure her; he made her afraid she would be seriously injured; and he made her have sex by force or threat of force.[3] Under the portion of the form that requires a written explanation of the basis for the request for protection, T.K. stated that H.K. had attempted to call her “several” times since September 8, 2005. T.K. further stated that she “ignored him till [sic] he called with my address.” T.K. elaborated on H.K.’s calls as follows:
9/12/05 — told me I better come back. 9/16/05 — He is sending his ex-wife Lujon who just got out of prison to take care of me. 10/05/05 — Left message if I know what is best I will bring [S.K.] to him. 11/08/05 — said he is coming to get [his] daughter and he knows where I am.
¶ 8. Among numerous other things, T.K. requested that the Russell County Circuit Court enjoin H.K. from the following: (1) threatening, attempting to commit, or committing acts of abuse against her or S.K.; (2) contacting her or S.K.; (3) being near her or S.K.; or (4) transferring unspecified property that she and H.K. mutually owned.
¶ 9. On December 5, 2005, the Alabama circuit court conducted a hearing on T.K/s petition. H.K. did not appear at that hearing. Two days later, the Alabama circuit court entered an order on T.K/s petition. The Alabama circuit court held that H.K. was prohibited from threatening or harassing T.K. Additionally, the Alabama circuit court held that H.K. was not allowed to contact or communicate with T.K.
¶ 10. On November 21, 2005, which was prior to the Alabama circuit court’s resolution of T.K/s petition, H.K. filed a complaint against T.K. in the Harrison County Chancery Court. Most pertinent to this appeal is H.K/s request that the chancery court modify the previous custody arrangement and award him primary physical custody of S.K. On January 13, 2006, the chancellor entered an order awarding H.K. with make-up visitation for the time that H.K. lost when T.K. kept S.K. from him with no contact. Additionally, the chancellor stated that the chancery court “shall be the arbiter or [sic] any dispute between the parties and the parties shall not seek to obtain the assistance of any court in any other jurisdiction.”
¶ 11. T.K. moved back to the Mississippi Gulf Coast in July 2006. Sometime prior to August 2006, H.K. became disturbed by things S.K. said during his visitation periods. S.K. indicated that Sergio Colon, an acquaintance of T.K/s, had sexually abused her. H.K. videotaped some of S.K.’s statements about Sergio. H.K. recorded S.K., who was three years old at that time, discussing how Sergio “licked her butt and her pee-pee.” Additionally, S.K. said that Sergio put her legs on his *1060 shoulders. S.K. demonstrated what she meant by lying on her back, widening her knees, and pulling her ankles toward her own shoulders. S.K. also demonstrated how Sergio “licked her butt and her pee-pee.” S.K. also mentioned that Sergio “held [a] turtle in him [sic] hands,” that the turtle was on her mouth, and that the “turtle pooped in her mouth.”[4]
¶ 12. The hearing on H.K.’s complaint for modification was scheduled for August 2006. However, when the chancellor first discovered H.K.’s concerns regarding potential sexual abuse, the chancellor took emergency action. As a result, S.K. was temporarily removed from T.K.’s custody and placed in a shelter.[5] The chancellor appointed Annette Williams as S.K’s guardian ad litem. Additionally, the chancellor appointed social worker Freída Kaletsch to conduct studies of H.K’s and T.K’s homes. Finally, the chancellor appointed J. Donald Matherne, Ph.D., a clinical psychologist, to interview S.K. regarding the assertion that she had been sexually abused.
¶ 18. On August 16, 2006, Dr. Matherne interviewed S.K. Dr. Matherne subsequently filed a written report that will be discussed in greater detail below. Paraphrasing for brevity’s sake, Dr. Matherne concluded that S.K.’s responses during the interview supported the assertion that S.K. had been sexually abused by a man named Sergio while she was in T.K.’s care.
¶ 14. However, on September 6, 2006, Williams, the guardian ad litem, filed a motion to return S.K. to T.K’s custody. Williams reported that she had interviewed T.K. and that she had “spoke[n] with” H.K., G.K., and the court-appointed social worker, among other people. Williams also stated that she based her motion on Dr. Matherne’s recommendation.[6] The next day, the chancellor entered an order returning S.K. to T.K’s custody on the condition that Sergio have no contact with S.K.
¶ 15. Shortly after recommending that S.K. be returned to T.K.’s custody, Williams filed a motion requesting that the chancellor order T.K., H.K., and G.K. to submit to psychological evaluations. In October 2006, T.K., H.K., and G.K. agreed to undergo psychological evaluations to be performed by Dr. Matherne. Dr. Math-erne evaluated H.K. and G.K. on January 10, 2007. Dr. Matherne concluded that “there is no information to contraindicate [H.K. as] being able to function as the custodial parent of the minor child” and that H.K. “should be given consideration for the custodial placement of the minor child.” Dr. Matherne declined to reach a “definitive custodial opinion” because T.K. had yet to report for her own court-ordered psychological evaluation. Dr. Math-erne found that G.K.’s “clinical profile [was] entirely within normal limits.” Dr. Matherne went on to state that he found “no information ... to contraindicate [G.K.] functioning as a surrogate parent for [S.K.]” if the chancellor placed S.K. in H.K.’s custody.
¶ 16. The next document in the record is the May 15, 2007, report of Williams, the guardian ad litem appointed to represent 5.K. Williams recommended that the chancellor place S.K. in H.K’s custody. Williams found that it was clear that S.K. *1061 had been sexually abused by Sergio while in T.K.’s custody. Additionally, Williams was disturbed by T.K.’s denial that she had a relationship with Sergio. Williams was also disturbed by T.K’s denial that Sergio had sexually abused S.K. Williams stated that she was “quite concerned” for S.K. because, in her opinion, T.K. would not protect S.K. from future abuse or believe S.K. if she was subjected to further abuse.
¶ 17. On June 26, 2007, Kaletsch, the court-appointed social worker, filed her report.[7] Kaletsch stated that, despite T.K.’s insistence that S.K. had not been sexually abused, based on Dr. Matherne’s report and other information, it was clear that S.K. had been abused by Sergio. Kaletsch recommended that H.K. receive custody of S.K. because it would be “very difficult for S.K. to therapeutically deal with the sexual abuse, should she remain with her mother.”
¶ 18. On July 12, 2007, T.K. finally reported to Dr. Matherne for the psychological evaluation she had agreed to undergo nine months earlier. T.K. gave Dr. Math-erne numerous excuses for failing to report earlier.[8] After two sessions with T.K., Dr. Matherne ultimately stated that T.K.’s “clinical profile does not reveal evidence of significant psychopathology.” However, Dr. Matherne found “some degree of defensiveness in [T.K’s] responses.” Dr. Matherne also found that T.K. “seemfed] somewhat reluctant to admit to problems.”
¶ 19. Dr. Matherne stated that T.K. had “strong needs for affiliation and positive regard from others” that could “result in rather uninhibited social behavior that may be seen by others as being attention-seeking and dramatic.” According to Dr. Matherne, T.K.’s “needs for attention and affiliation can be so strong that the quality of her social interactions may be relatively unimportant as compared to their quantity.” Dr. Matherne’s “diagnostic impression” was that T.K. had what he described as an “Axis I: Adjustment Disorder.” Based on the information he obtained in his consultation, Dr. Matherne found that there was “insufficient evidence” that T.K. was aware that S.K. had been sexually abused “if in fact this abuse did occur.” Dr. Matherne also concluded “that there is insufficient evidence to place [S.K.] with anyone other than her mother.”
¶ 20. In early March 2008, the parties went to trial. Aside from the previously-mentioned reports, which had been filed prior to the trial, the chancellor heard testimony from H.K., T.K., G.K., and G.K’s adult daughter. In August 2008, the chancellor entered his judgment finding that it was necessary to modify custody and award primary physical custody of S.K. to H.K. T.K. appeals.
*1062 STANDARD OF REVIEW
¶ 21. This Court is bound by a limited standard of review regarding a chancellor’s decisions regarding child custody determinations. Johnson v. Gray, 859 So.2d 1006, 1012(¶ 31) (Miss.2003). Pursuant to that limited standard of review, we will not reverse a chancellor’s factual determination unless it was manifestly wrong or clearly erroneous. Id. Stated differently, we will not disturb the chancellor’s findings of fact if those findings are supported by substantial, credible evidence. Id. (citing Marascalco v. Mar-ascalco, 445 So.2d 1380, 1382 (Miss.1984)). However, we will reverse the chancellor’s judgment if we find that the chancellor applied an erroneous legal standard. Id.
ANALYSIS
¶ 22. T.K. claims the chancellor erred when he found that it was necessary to modify custody of S.K. When seeking to modify custody of a child, “a non-custodial party must prove [that]: (1) there has been a substantial change in circumstances affecting the child; (2) the change adversely affects the [child’s] welfare; and (3) a change in custody is in the best interest of the child.” Johnson, 859 So.2d at 1013(¶ 33) (citing Bredemeier v. Jackson, 689 So.2d 770, 775 (Miss.1997)). Furthermore, it is well settled that the polestar consideration in any child custody matter is the best interest and welfare of the child. Id.; see also Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983).
1. Material Change in Circumstances
¶ 23. “Modification [of a child custody order] must be based on conduct of the custodial parent that poses a danger to the mental or emotional health of the child.” Powell v. Powell, 976 So.2d 358, 361(¶ 11) (Miss.Ct.App.2008) (citing Giannaris v. Giannaris, 960 So.2d 462, 467(¶ 9) (Miss.2007)). “In determining whether a material change in circumstances has occurred, the chancellor must consider the totality of the circumstances.” Id. T.K. claims the chancellor erred when he found that there had been a material change in circumstances. We disagree.
¶ 24. In considering the totality of the circumstances, the chancellor mentioned four things that caused him to conclude that there had been a material change in circumstances: (1) his conclusion that S.K. had been sexually abused by Sergio while in T.K’s care; (2) T.K.’s refusal to believe that S.K. had been sexually abused by Sergio; (3) T.K.’s failure to inform H.K. of S.K.’s location while she and S.K. were in Phenix City, Alabama after Hurricane Katrina; and (4) T.K.’s Alabama petition for protection from abuse. T.K. claims that the chancellor erred. According to T.K., none of the rationales cited by the chancellor should have been a basis for his conclusion that there had been a material change in circumstances.
A. Abuse and T.K.’s Denial that It Occurred
¶ 25. T.K. argues that “the fact of the molestation is not, in and of itself, sufficient to create a change of circumstances” and that “[t]he important issue ... is not whether abuse occurred.” According to T.K., “[t]he important issue” is “whether [her] actions, and her denial of the allegations, constituted a danger to ... [S.K.].” T.K. then cites Morrow v. Morrow, 591 So.2d 829, 833 (Miss.1991) for the principle that “only parental behavior that poses a clear danger to the child’s mental or emotional health can justify a custody change.” Additionally, T.K. seems to attack S.K.’s credibility. According to T.K’s brief, “[t]he child also told some fairly unusual things to the psychologist which tend to reduce the credibility of her story.” *1063 Another portion of T.K.’s brief states that the “allegations of abuse arose under suspicious circumstances which should give pause to the court in its determination of whether a change in circumstances arose.”
¶ 26. However, resolution of factual disputes is always a matter entrusted to the sound discretion of the chancellor. Carter v. Carter, 735 So.2d 1109, 1114(¶ 19) (Miss. Ct.App.1999). Accordingly, we decline to reweigh S.K’s credibility or cast doubt on the assertion that S.K. had been sexually abused without first finding that there was no substantial, credible evidence to support the chancellor’s determination. Reviewing the evidence before the chancellor, we find that there was certainly substantial evidence for the chancellor’s finding that S.K. had been sexually abused while in T.K’s care.
¶ 27. We have previously discussed S.K’s statements that were recorded by H.K. S.K. made remarkably similar statements to Dr. Matherne. In his report following his evaluation of S.K., Dr. Math-erne’s stated:
[S.K.] was asked if she knew a person named Sergio. She said that Sergio “tried to get my legs on his shoulder.” She said that Sergio “took off my clothes.” She said that Sergio “took my shirt off.” She said that her mother was in the kitchen. She then said that Sergio “took my pants off and my panties.” She was specifically asked who had done this. She said, “Sergio.” She was asked why he had taken off her clothing. Her response was, “To look at my body.” She then spontaneously said, “Sergio touched me with him [sic] hands.”
Dr. Matherne went on to state that he reviewed anatomical drawings with S.K., who said that Sergio had “touched me on my belly. He touched me right here.” According to Dr. Matherne, S.K. “pointed to the vaginal area in the drawing.” Dr. Matherne also reported that S.K. said Sergio “touched ‘my pee-pee.’ ” Dr. Matherne stated that S.K. said that Sergio “put his ‘mouth right here,’ pointing to the vaginal area in the drawing ... [and] said specifically that he had put ‘his tongue’ on this area of her body.”
¶ 28. Dr. Matherne went on to report as follows:
[S.K.] said that [Sergio] had touched her “on my butt.” She said that he had touched her with his mouth and more specifically with “him [sic] tongue.” At this point, this child pointed to her tongue to indicate more specifically to this clinician what part Sergio touched her with when he came into contact with her buttocks area.
Finally, Dr. Matherne reported that, according to S.K., “she told ‘mommy and she said that he wasn’t supposed to be licking my butt and pee-pee.’ The child claims that her mother did talk to Sergio and ‘he didn’t say anything.’ She said that her mother got an officer and Sergio got handcuffed.” Dr. Matherne ultimately concluded that, “based on the information obtained in this consultation, this clinician is of the opinion that the allegation of sexual abuse is substantiated.”
¶ 29. Additionally, the chancellor could have reasonably discounted T.K.’s own credibility in stating that Sergio did not sexually abuse S.K. T.K. consistently maintained that she and Sergio did not have a romantic relationship. According to T.K., as reported by Kaletsch, Sergio was a “client.” However, Kaletsch had spoken with Georgia Laningham, who had met T.K. and S.K. in Phenix City, Alabama. Laningham told Kaletsch that her brother, Jerry Brooks, had given T.K. the use of his Lexus and had helped her get a job in a local school system. Kaletsch also reported as follows:
*1064 Ms. Georgia discussed the behavior she observed between Sergio Colon and [T.K.]. Ms. Georgia said she witnessed [T.K.] driving Sergio Colon around in Mr. Brooks’[s] Lexus. According to Ms. Georgia, Sergio is a tall (6' 4") young man who has been a client of the Lazarus Center in Phoenix [sic] City, Alabama. Ms. Georgia said she witnessed [T.K.] and Sergio kissing, holding hands, and embracing publicly. She said [T.K.] is lying when she says she was helping Sergio in any sort of official capacity. She said the public display of affection between Sergio and T.K., [sic] proved to her their relationship was romantic, not therapeutic.
Additionally, T.K. reported to Williams, the guardian ad litem, that “she was not meant to be alone.” Williams made it clear that T.K. was referencing the concept that she preferred to be involved in a relationship with someone as opposed to being single. Accordingly, the chancellor could have found that T.K. was less credible because her assertion that S.K. had not been sexually abused was based on T.K.’s motivation to lie on behalf of a man with whom she previously had a romantic interest.
¶ 30. Additionally, Dr. Matherne interviewed T.K. and found that “[t]here [was] some degree of defensiveness in [T.K’s] responses and she seems somewhat reluctant to admit to problems.” The chancellor could have found that T.K.’s refusal to admit that S.K. had been sexually abused while under her care by a man with whom she had a romantic relationship was consistent with Dr. Matherne’s conclusion regarding T.K.’s reluctance to admit to problems. In any event, it was within the chancellor’s discretion to weigh the evidence and find as a fact that S.K. had been sexually abused by Sergio while she was in T.K’s care. Furthermore, based on the finding that S.K. had been sexually abused by Sergio while she was in T.K’s care— and the fact that T.K. denied that it had occurred or that S.K. needed counseling— we find that there was substantial, credible evidence to support the chancellor’s decision that there had been a material change in circumstances.
B. T.K’s Move to Alabama
¶ 31. T.K. claims the chancellor erred when he listed her move to Alabama among the reasons he found that there had been a material change in circumstances. T.K’s relocation deprived H.K. of his court-ordered visitation with S.K. Citing Mixon v. Sharp, 853 So.2d 834, 838(¶ 10) (Miss.Ct.App.2003), T.K. argues that lack of cooperation with a non-custodial parent’s visitation is a matter that should be resolved in contempt proceedings.
¶ 32. However, T.K’s move affected more than H.K’s visitation rights. When T.K. moved, she did not tell H.K. where she was going with S.K. For two months, H.K. was uninformed of S.K.’s whereabouts. H.K. repeatedly attempted to call T.K., but T.K. admitted that she ignored his calls and messages. T.K. never told H.K. where S.K. was, how he could reach her, or when he might see her again. H.K. had no idea of whether S.K. was healthy or provided for. Moving without informing H.K. of S.K’s whereabouts and completely refusing to communicate with H.K. could reasonably be characterized as more egregious than simply failing to cooperate with H.K. regarding visitation. Based on the totality of the circumstances, the chancellor did not err when he found that T.K.’s move contributed to the material change in circumstances.
C. T.K’s Petition for Protection from Abuse
¶ 33. The chancellor commented that T.K.’s Alabama petition for protection *1065 from abuse was also a basis for his finding that there had been a material change in circumstances. The chancellor mentioned that T.K. filed her petition despite the fact that H.K. had not been to Alabama during the entire time that T.K. had secretly relocated to Phenix City, Alabama. T.K. claims that the chancellor misinterpreted her petition. T.K. claims that the chancellor should have realized that she based her petition on the concept that H.K. had made threatening phone calls to her.
¶ 34. If the chancellor did in fact misinterpret T.K’s petition, there was a basis for the chancellor’s misinterpretation. As previously stated, T.K. claimed in her petition that: H.K. had injured her; he had tried to injure her; he threatened to injure her; he made her afraid she would be seriously injured; and he made her have sex by force or threat of force. It appears that someone struck through the check marks in the boxes for “injured me,” “[tjried to injure me,” and “[m]ade me have sex by force or threat of force.” The initials “TK” appear next to the struck through cheek marks. Presumably, those are T.K.’s initials. However, it is unclear exactly when those checked boxes were struck through. The record does not indicate that those boxes had been struck through at the time the petition was filed. However, we decline to find that those boxes were not struck through at the time of the petition.
¶ 35. Even if we were to find that the chancellor erred in his characterization of T.K.’s petition, that finding would not counter our previous determination that there was substantial, credible evidence to support the chancellor’s conclusion that there had been a material change in circumstances based on the matters discussed above. Accordingly, although we do not find that the chancellor erred, if we were to find any error, it would be harmless.
2. The Change in Circumstances Is Adverse to the Child’s Best Interest
¶ 36. As for whether the change in circumstances is adverse to S.K.’s best interest, there can be no doubt that it is— particularly because S.K. indicated that she had informed T.K. about Sergio, but T.K. not only denied that it had occurred in the face of significant evidence to the contrary, she also denied that her daughter should receive counseling to cope with the abuse.
¶ 37. “Although we usually determine that a material change in circumstances has occurred based on evidence that has a present adverse effect on the child, this Court has found that ‘in limited circumstances, adverse effects exist if it is shown that it is reasonably foreseeable that the child will suffer adverse effects because the child’s present custodial environment is clearly detrimental to his or her well[-]being.’ ” Holmes v. Holmes, 958 So.2d 844, 848(¶ 18) (Miss.Ct.App.2007) (quoting Savell v. Morrison, 929 So.2d 414, 418-19(¶ 13) (Miss.Ct.App.2006)). Likewise, the child does not have to suffer actual injury before a court can find an adverse effect. Id.
¶ 38. Kaletsch, the court-appointed social worker, stated that her “concern is the fact that [T.K.] still maintains [the molestation] did not happen.” Kaletsch then opined that it would “be very difficult for [S.K.] to therapeutically deal with the sexual abuse, should she remain with her mother.” Williams, the guardian ad litem, reported that she was “quite concerned for [S.K.] [because] I do not believe her mother will believe her in the future, much less protect her should something like this happen again.” Accordingly, it was foreseeable that S.K. will be adversely affected by *1066 T.K.’s refusal to believe S.K. had been sexually abused and T.K’s refusal to believe that S.K. needs counseling to cope with being sexually abused when she was under T.K.’s care. Accordingly, we find no merit to T.K.’s claim that the chancellor erred when he found a material change in circumstances in the custodial parent’s home that is adverse to the child’s well-being.
¶ 39. In R.L.S., 807 So.2d at 1260(¶ 49), a chancellor found that there had been a material change in circumstances regarding child custody based on the fact that the child at issue in that case had been sexually abused while in the care of the custodial parent. However, the chancellor went on to hold that, despite the material change in circumstances, the previous custodial parent should retain custody of the child. Id. This Court found that the chancellor erred when he found that it was in the child’s best interest to remain with the mother, because the child had been sexually abused by a male acquaintance while in her care. Id. at 1261(¶ 54). This Court noted that the custodial mother in R.L.S. “acted in a manner to conceal or protect” the abuser and “exemplified extremely poor parental judgment.” Id. This Court also noted that “the material change in the overall living conditions ... will likely remain in the foreseeable future [and the mother] shows no responsibility for her inappropriate parental behavior, nor a propensity to change.” Id. at 1262(¶ 56).
¶ 40. In this case, while there was not any evidence that T.K. acted to conceal or protect Sergio, T.K. refused to believe that Sergio had sexually abused S.K. T.K. resolutely maintained her position despite S.K’s description of the events and Dr. Matherne’s conclusion that his interview of S.K. substantiated the child’s reports. Additionally, contrary to recommendations for court-appointed personnel, T.K. refused to believe that S.K. should attend counseling sessions to help her cope with being abused As in R.L.S., this material change in S.K.’s circumstances will remain for the foreseeable future. S.K. must now cope not only with having been sexually abused, but also with the fact that her mother does not believe that she was sexually abused. Also similar to R.L.S., T.K.’s refusal to believe that S.K. needs counseling could reasonably be considered as showing no propensity to change her opinion. The chancellor could have reasonably concluded that if S.K. were to remain in T.K’s care, that would exacerbate not only the harm S.K. suffered in the past but also the harm she will likely suffer in the future.
¶ 41. The facts regarding the molestation that occurred in R.L.S. are more developed than the facts surrounding the molestation that occurred in this case. However, the development of the facts in any case of this type are subject to the victim’s age, ability, and willingness to explain the abuse they suffered. Very young children may not even be aware that what occurred was something that must be communicated. Accordingly, the chancellor acted pursuant to his discretion when he considered S.K.’s ability as a three-year-old to communicate what had happened to her.
3. Modification of Custody Is in the Child’s Best Interest
¶ 42. The third factor of the test to determine whether it is necessary to modify a previous child custody order is whether a change in custody is in the best interest of the child. Johnson, 859 So.2d at 1013(¶ 33) (citing Bredemeier, 689 So.2d at 775). Furthermore, it is well settled that the polestar consideration in any child custody matter is the best interest and welfare of the child. Id. To determine *1067 whether a change in custody is in the best interest of the child, the chancellor appropriately applied the familiar Albright factors. E.g., McRee v. McRee, 723 So.2d 1217, 1220(¶ 11) (Miss.Ct.App.1998) (holding that upon a finding of a material change in circumstances, a court is to apply the Albright factors to determine which parent should have primary custody of a child).
¶ 43. The Albright factors are: (1) age, health, and sex of the child; (2) a determination of the parent that had the continuity of care prior to the separation; (3) which parent has the best parenting skills and which parent has the willingness and capacity to provide primary child care; (4) the employment of the parent and responsibilities of that employment; (5) the physical and mental health and age of the parents; (6) the emotional ties of parent and child; (7) the moral fitness of the parents; (8) the home, school, and community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; (10) the stability of the home environment and employment of each parent; and (11) other factors relevant to the parent-child relationship. Albright, 437 So.2d at 1005. T.K. claims that the chancellor erred in weighing six of the Albright factors.
A. Continuity of Care
¶ 44. The chancellor held that, as the prior custodial parent, T.K. provided the majority of S.K’s care. However, the chancellor went on to hold that “[t]he material change in circumstances mitigate against finding that this factor favored [T.K.]” and that “[H.K.] and [G.K.] provided an adequate and safe environment for [S.K.] while she was in their custody.” We interpret the chancellor as having found that this factor favored H.K.
¶ 45. T.K. claims that the chancellor should have found that this factor favored her. According to T.K., the chancellor should not have found that the material change in circumstances negated any favorable consideration she might have otherwise received under this factor. T.K. also argues that H.K. had little to do with S.K. after he and T.K. divorced.
¶ 46. The chancellor could have reasonably held that although T.K. technically provided the longer duration of S.K.’s care, the relatively poor quality of that care negated the fact that T.K. had technically provided chronologically longer care. The chancellor could have also considered that because T.K. absconded with S.K., T.K. contributed to the comparatively less time H.K. was able to spend with S.K. We find that the chancellor acted within his discretion when he weighed this factor.
B. Parenting Skills and Willingness and Capacity to Provide Child Care
¶ 47. The chancellor noted that “[b]oth [T.K.] and [H.K.] had adequate parenting skills and the willingness and capacity to provide primary child care to [S.K.].” The chancellor went on to state that “[T.K.] engages in activities with [S.K.] and has [S.K.] in the after school program at Bayou View elementary where [T.K.] is employed. [H.K.] reads, colors, and plays with [S.K.].” The chancellor then found that this factor “moderately” favored T.K.
¶ 48. According to T.K., rather than finding that this factor “moderately” favored her, the chancellor should have found that this factor “overwhelmingly” favored her. T.K’s argument is based on her claims that H.K.: (1) did not participate in school activities or conferences; (2) did not attend birthday parties; (3) had almost no financial involvement in [S.K.’s] life other than the minimum child support; *1068 (4) did not help with costs of S.K/s private school; and (5) was not involved with S.K.’s “extracurricular activities.” T.K. also claims that H.K. was not concerned for S.K.’s medical care “because he never contributed his share of’ S.K/s medical insurance. Finally, T.K. argues that “[H.K.] demonstrated little, if any, willingness to be a primary care giver [sic].” As T.K. does not elaborate on the basis of her final assertion, nor does she cite to any point in the record where this Court might determine the basis of such a vague and generalized assertion, we will not address T.K.’s generic claim that H.K. was not willing or expressed little willingness to be S.K.’s primary caregiver.
¶ 49. We will not reweigh the evidence to determine whether this factor “overwhelmingly” rather than “moderately” favored T.K. There was substantial evidence for the chancellor’s conclusion that this factor “moderately” favored T.K. Accordingly, we find no error in the chancellor’s characterization of the degree to which this factor favored T.K.
C. Employment of the Parent and Responsibilities of That Employment
¶ 50. Regarding this factor, the chancellor detailed H.K/s and T.K.’s respective recent employment history and held that “[w]ith [G.K.] present to assist [H.K.], this factor favored neither party. If [G.K.] were not present, it would have favored [T.K.].”
¶ 51. In so doing, T.K. re-characterizes H.K.’s employment in a more negative light and then argues, in essence, that G.K. had no impact on H.K/s employment or his employment responsibilities. T.K. concludes her argument that the chancellor should have found that this factor favored her by reiterating her employment as an educator and the fact that she does not have to work during the summer.
¶ 52. In Stark v. Anderson, 748 So.2d 838, 843-44 (¶¶ 11-12) (Miss.Ct.App.1999), this Court upheld a chancellor’s decision to modify custody based, in part, on aspects of the presence of stepparents. We find that, under the circumstances, it was within the chancellor’s discretion to consider that G.K. had some effect on H.K/s employment responsibilities. Accordingly, we find no per se error in the chancellor’s decision to include G.K. in his discussion of this factor.
D. Physical and Mental Health and Age of the Parents
¶ 53. In this factor, the chancellor discussed H.K/s and T.K.’s ages and their health. The chancellor noted that: H.K. had previously injured one of his knees; he took medication that effectively regulated his cholesterol; he does not drink alcohol; and he smokes. The chancellor also noted that H.K. did not smoke in S.K.’s presence when she was at his house. The chancellor went on to discuss the fact that T.K/s physical health was good and that she takes forty milligrams of Prozac on a daily basis to treat depression. The chancellor noted that T.K. described her dosage as a “high dose.” Finally, the chancellor discussed the fact that T.K. inconsistently told Dr. Matherne that: she took twenty milligrams of Prozac each day; she “rarely” drinks alcohol; and she “smokes occasionally, but not around [S.K.].” The chancellor then found that this factor favored H.K.
¶ 54. T.K. claims that the chancellor should have found that this factor favored neither party. T.K. argues that depression is a common ailment; she also asserts that the chancellor did not mention the fact that H.K. had taken “Wellbutrin, another medication for depression.” T.K. then states that because H.K. had taken a prescription medication for depression, the *1069 chancellor should have found that H.K. was not in any better health than she was.
¶ 55. There was substantial, credible evidence for the chancellor’s resolution of this factor. T.K. fails to mention that H.K. was prescribed Wellbutrin approximately six years prior to his interview with Dr. Matherne. T.K. also fails to mention that: H.K. only took Wellbutrin for a brief period; he did not take it at the time of Dr. Matherne’s interview; and he did not take any medication for depression at the time of the chancellor’s determination. Accordingly, we find no error based on the chancellor’s decision to omit discussion of the fact that H.K. once took Wellbutrin.
E. Moral Fitness of the Parents
¶ 56. Under this factor, the chancellor noted that: H.K. had been married five times; he lived with G.K. before they were married; and he had visitation with S.K. during that time. The chancellor then noted that: H.K. was Jewish; he did not attend synagogue, but he and S.K. would attend a reformed synagogue if he received custody of her. Next, the chancellor discussed the fact that T.K. had been married three times and that T.K. took S.K. to Bethel Lutheran Church.
¶ 57. The chancellor also mentioned that T.K. told Dr. Matherne that she took twenty milligrams of Prozac each day, while she testified at trial that she took forty milligrams of Prozac each day. The chancellor found that T.K. “misstated her Prozac dosage.” However, the chancellor stated that he “cannot find that this was intentional.” The chancellor went on to accept T.K.’s testimony that she took forty milligrams of Prozac daily and that he was “concerned Dr. Matherne may have found the 40mg dosage to have been important to his evaluation.” The chancellor then found that this factor favored neither party-
¶ 58. T.K. claims that the chancellor should have found that this factor favored her. T.K. argues that the chancellor should have considered that: H.K. smokes; smoke “constantly lingers” in H.K’s home; and S.K. is subjected to second-hand smoke when she is in H.K.’s care. There was no evidence that smoke “constantly lingers” in H.K’s home. H.K. testified that he does not smoke in S.K.’s presence and that he smokes in a separate part of the house. The chancellor could have reasonably omitted discussion of those facts on the basis that they do not tend to prove that H.K. is somehow a less moral person. Although T.K. discusses H.K’s smoking, even she does not indicate exactly how it negatively affects H.K.’s morality. Accordingly, it was within the chancellor’s discretion to omit discussion of any facts related to H.K.’s smoking in weighing H.K’s morality.
¶ 59. Next, T.K. argues that the chancellor erred because he did not discuss the fact that H.K. and G.K. had lived together before they were married, including times when H.K. had S.K. for his visitation. T.K. also points out that H.K. and G.K. lived together before she and H.K. were divorced. The chancellor could have weighed the evidence and concluded that simply because H.K. and G.K. had lived together, even during H.K.’s visitation with S.K., those facts in and of themselves do not make H.K. less moral. There was no evidence that S.K. was harmed by the fact that H.K. and G.K. had lived together before they were married. Additionally, the chancellor could have found that H.K. was not less moral simply because he and G.K. began living together sometime during the two-year time between the time that H.K. and T.K. separated and divorced. Accordingly, it was within the chancellor’s discretion to omit discussion of those facts.
*1070 ¶ 60. Next, T.K. addresses the chancellor’s discussion of the discrepancy in her statements regarding her daily dosage of Prozac. T.K. interprets the chancellor as having found that she was dishonest about her daily dosage of Prozac because the chancellor found that T.K. “misstated” her daily dosage. T.K. notes that there was an eight-month difference between the time she told Dr. Matherne that she took twenty milligrams of Prozac and the time that she testified that she took forty milligrams of Prozac. T.K. states that “[n]either the attorneys nor the court inquired about the differences in those amounts.”
¶ 61. We disagree with T.K’s interpretation. The chancellor also found that there was no evidence that T.K’s misstatement of her daily dosage was intentional. The chancellor did not find that T.K. had lied about her daily dosage of Prozac. He merely found that Dr. Matherne might have found it important to his psychological evaluation of T.K. There was testimony that there was a discrepancy in T.K.’s reported daily dosage of Prozac. There was no testimony that a physician had increased her daily dosage since Dr. Math-erne’s psychological report. While the chancellor did not inquire into the basis of the discrepancy, it is not the chancellor’s responsibility to do so. If there was such a basis for the discrepancy, S.K.’s attorney bore the responsibility of ensuring that such evidence was in the record.
¶ 62. Finally, T.K. claims that the chancellor erred by not considering what she describes as “gratuitous lies” about her. During H.K’s psychological evaluation, he told Dr. Matherne that T.K. had been sexually abused by her father; she had been a “professional call girl”; she was bisexual; and T.K. had been involved with a cult. At the trial, T.K’s attorney confronted H.K. regarding those matters. H.K. specified that his knowledge of those matters was based solely on what T.K. had told him. He also testified that he believed that they were true. Contrary to T.K.’s assertion on appeal, we can find no discrepancies in what H.K. told Dr. Matherne and his testimony at trial. T.K. denied that those assertions were true. In any event, the chancellor acted within his discretion when he omitted discussion of those facts. The chancellor could have found that there was insufficient evidence to determine whether H.K. or T.K. was truthful regarding whether those things had occurred. Having reviewed T.K’s arguments under this factor regarding matters that, according to her, should have been considered during the chancellor’s discussion of this factor, we find that the chancellor acted within his discretion at all times. We find no merit to this portion of T.K’s argument.
F. Other Relevant Factors
¶ 63. Under this heading, the chancellor discussed all aspects of the sexual abuse that S.K. suffered. The chancellor also noted that T.K. denied that S.K. needed counseling. Finally, the chancellor noted that Williams, the guardian ad litem, and Kaletsch, the court-appointed social worker in this case, both recommended that H.K. receive custody of S.K. We interpret the chancellor as having found that this factor favored placing S.K. in H.K’s custody.
¶ 64. T.K. claims the chancellor erred in several aspects under this factor. First, T.K. complains that Williams and Kaletsch both failed to prepare their reports appropriately and that they exceeded their authority in recommending that H.K. receive custody of S.K. However, T.K. never raised any of those arguments before the chancellor. We will not find that a trial judge erred in failing to decide a matter that was never presented to him or her. Birrages v. Ill. Cent. R.R., 950 So.2d 188, *1071 194(¶ 18) (Miss.Ct.App.2006). We will not consider an issue that was not first presented to the trial court. Accordingly, this portion of T.K’s argument is procedurally barred.
¶ 65. Next, T.K. points out that although Williams ultimately recommended that H.K. receive custody of S.K., Williams had also recommended that the chancellor return S.K. to T.K.’s custody after the chancellor was aware of what were, at that time, allegations that Sergio had sexually abused S.K. Williams filed her recommendation prior to the trial and stated that she believed that T.K. “is protective and will insure that no opportunity for abuse shall occur while [S.K.] is in her custody.” Be that as it may, the fact remains that, Williams appropriately considered the totality of the circumstances, and it was within her authority to recommend that it was in S.K’s best interest that H.K. receive custody of S.K. Likewise, it was within the chancellor’s discretion to concur with Williams’s recommendation.
¶ 66. Additionally, T.K. claims the chancellor erred in stating that awarding H.K. custody of S.K. was “consistent with the recommendation of Dr. Matherne following his evaluation of the child.” T.K. claims that the chancellor’s statement “is blatantly false.” According to T.K., “Dr. Matherne made no such recommendation.” T.K. points out that, after her psychological evaluation, Dr. Matherne reported that there was “insufficient evidence to indicate that [T.K.] ... would have been aware of the abuse of her daughter, if in fact this abuse did occur.” T.K. also notes that Dr. Matherne stated that there was “insufficient evidence to place [S.K.] with anyone other than her mother.”
¶ 67. The chancellor could have reasonably interpreted Dr. Matherne’s statements as Dr. Matherne’s hesitation to act as a fact-finder and determine, based on the information he heard from T.K., that S.K. had been sexually abused. Dr. Math-erne certainly did not state that, in his opinion, S.K. had not been sexually abused. Additionally, Dr. Matherne’s evaluated S.K. and reported that, in his opinion, the allegations of sexual abuse were “substantiated.” Additionally, it is possible that the chancellor was referring to other portions of Dr. Matherne’s report after evaluating S.K. or H.K. That is, the chancellor could have reasonably been referring to that portion of Dr. Matherne’s report in which he stated that nothing in H.K.’s psychological profile caused him to believe that it would not be in S.K.’s best interest that H.K. receive custody of her. We find no error under this portion of T.K.’s argument.
CONCLUSION
¶ 68. We find that the chancellor did not abuse his discretion when he found that there had been a material change in circumstances that was adverse to S.K’s best interest. Additionally, we find no error in the chancellor’s application of the Albright factors or his conclusion that it was in S.K.’s best interest that H.K. receive primary custody of S.K. Accordingly, we affirm the chancellor’s judgment modifying custody and awarding H.K. primary custody of S.K.
¶ 69. THE JUDGMENT OF THE HARRISON COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, CARLTON AND MAXWELL, JJ, CONCUR. IRVING, J„ CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.

. "Although this case was filed with the full name of the parents and child involved stated, in deference to the child involved and the facts of this case, we have chosen to use the initials of the parents and the child.” R.L.S. v. A.R.S., 807 So.2d 1251, 1252(111) (Miss.Ct. App.2001).

. H.K.’s testimony at trial was that "[w]e had a discount beer and tobacco store.” As best we can tell, H.K. owned that store along with G.K. H.K. and G.K. were not married at the time that H.K. allowed T.K. to take items from the store.

. It appears that someone struck through the check marks in the boxes for "injured me,” "[t]ried to injure me,” and "[mjade me have sex by force or threat of force.” The initials "TK” appear next to the struck through check marks. Presumably, those are T.K/s initials. However, it is unclear exactly when those checked boxes were struck through.

. There was some concern that S.K. was relating that Sergio forced her to perform oral sex and that she was describing ejaculation.

. On August 30, 2006, S.K. was placed in the custody of G.K.'s adult daughter.

. Nothing in Dr. Matherne’s written August 2006 report contained a recommendation that S.K. be returned to T.K.’s custody.

. A note on the first page of her report indicates that she prepared her report on September 26, 2006. However, because T.K. had yet to appear for her court-ordered psychological evaluation by Dr. Matherne, Kaletsch had waited to reach any conclusions. Kaletsch waited nine months for T.K. to schedule her evaluation.

. T.K. told Dr. Matherne that her attorney did not give her a copy of the court order until "perhaps May 2007.” She also told Dr. Matherne that someone in his office told her that he would be out of the office for thirty days. However, Dr. Matherne stated that T.K. "would not have been told this by the office manager, as this clinician has not ever been out of town for 30 days in his 37-year career.” Additionally, T.K. told Dr. Matherne that someone in his office told her that he "did not do custody evaluations.” Dr. Math-erne ultimately considered it "unclear why there was such a significant delay in her contacting [his] office for Lher] psychological evaluation.”