ROBERTS, J., for the Court:
¶ 1. Marcus Crittenden appeals the Ok-tibbeha County Chancery Court’s decision to deny his request to find his ex-wife, Susan Crittenden, in contempt for a number of reasons. Marcus also claims that the chancellor erred when he increased Marcus’s periodic-alimony obligation and ordered him to transfer a portion of his retirement to Susan. Marcus further claims that, the chancellor erred when he declined to modify custody of one of his and Susan’s six sons. Additionally, Marcus claims the chancellor erred when he did not adequately modify his child-support obligation based on the fact that one of his and Susan’s sons no longer lived with Susan.
¶ 2. Susan cross-appeals and claims the chancellor should have found Marcus in contempt for failing to pay the mortgages on the former marital home and the property that surrounds it. By extension, Susan argues that the chancellor should have awarded her attorney’s fees for Marcus’s contempt. Susan also claims the chancellor did not consider all of Marcus’s potential income when the chancellor calculated Marcus’s modified child-support obligation. Finally, Susan requests attorney’s fees on appeal. Finding no error, we affirm on direct and cross-appeal.
FACTS AND PROCEDURAL HISTORY
¶ 3. Marcus and Susan were married on New Year’s Day of 1987. They had six sons during the course of their twenty-three-year marriage.[1] The marital home was in the center of 115 acres of wooded property. Marcus is an emergency-room physician. During the marriage, Susan was primarily a homemaker.[2]
¶4. In early 2010, Susan filed a complaint for divorce based on adultery or habitual cruel and inhuman treatment. Marcus reciprocated with a counter-complaint for divorce based on the same grounds. They later consented to divorce based on their irreconcilable differences. They agreed that Susan would receive custody of the minor children. But they requested that the chancellor resolve a number of other issues, including division of the marital estate, the amount of Marcus’s child-support obligation, the necessity and *951 value of alimony payable to Susan, and Susan’s request for attorney’s fees.
¶ 5. Marcus and Susan stipulated to the value, debt, and equity of the marital home and the real property that surrounded it. The home and the five acres that it sits on appraised for approximately $475,000. The remaining 110 acres around the marital home appraised for approximately $253,000. The mortgage debt on the home and surrounding property was approximately $517,000. And the monthly mortgage payments were approximately $5,400. During April 2010, the chancellor entered a temporary order requiring Marcus to leave the marital home and continue to pay for the family’s obligations.
¶ 6. Marcus and Susan went to trial during August 2010. On October 11, 2010, the chancellor entered his initial order. The chancellor awarded the couple joint legal custody of the five minor children. As Marcus and Susan agreed, Susan received primary physical custody of the five minor children. Marcus received visitation with the children. Because of Marcus’s uncertain work schedule, the chancellor established a procedure by which Marcus was to request visitation in writing, and Susan was to respond to his request. The chancellor ordered Marcus to pay Susan $4,500 per month in child support and $1,000 per month in periodic alimony. The chancellor also evenly divided Marcus’s retirement accounts.
¶ 7. The couple also owned property described as the “Crossgate Property.” It was purchased for Susan’s mother, who had a life estate on the property. The chancellor found that the Crossgate Property could not be sold without the consent of Susan’s mother. So the chancellor held that Susan and Marcus would divide the equity from the Crossgate Property when it sold at a later date. Meanwhile, Marcus would be obligated to continue paying the mortgage on the Crossgate Property. Furthermore, Marcus would receive the equity that accrued after the date of the chancellor’s judgment. Marcus was also ordered to pay the couple’s debt to the Internal Revenue Service.
¶ 8. The chancellor held that the marital home and the property surrounding it would be sold. Marcus was obligated to continue paying the mortgage, insurance, and taxes related to the home until it sold. The house was to be listed with a realtor after January 8, 2011. If the home had not sold by October 8, 2011, the chancery clerk would be appointed as a special commissioner to sell the home per the laws of commissioner sales. The net proceeds were to be divided evenly, and Marcus would receive the equity that accrued after the date of the judgment.
¶ 9. Susan was unhappy with the chancellor’s order to sell the marital home. According to Marcus, Susan said she would “fight” the order to sell the marital home “until her dying breath.” Susan appealed the chancellor’s judgment and moved to stay the sale of the marital home. The chancellor denied Susan’s motion to stay, and the Mississippi Supreme Court later dismissed Susan’s appeal.
¶ 10. Marcus claimed that Susan attempted to prevent the sale of the marital home. He alleged that she refused to let him put up “for sale” signs, and she took down the signs that he put up. Marcus also claims that Susan refused to allow him on the property so that he could maintain it. According to Marcus, Susan called the authorities and threatened to file criminal charges against him if he kept trying to contact her about the sale of the property.
¶ 11. On February 4, 2011, Susan filed a complaint for contempt based on the fact that Marcus had not obeyed the chancellor’s order to pay the mortgages on the *952 marital home and the surrounding property. Marcus reciprocated with a counter-complaint for contempt alleging, among other things, that Susan was obstructing his efforts to sell the marital home and the surrounding property. Marcus also claimed that he could no longer afford the mortgages along with his other financial obligations. Marcus also sought to modify custody of Adam, who no longer lived with Susan. Additionally, Marcus sought to modify his child-support obligation.
¶ 12. According to Marcus, Susan’s effort to obstruct the sale of the marital home was the catalyst that led to his financial problems, which culminated in his filing for Chapter 13 bankruptcy in April 2011. As a result, Marcus was legally divested of his ownership interest in the marital home and the surrounding property. Because the automatic stay associated with Marcus’s bankruptcy prevented creditors from pursuing him for the mortgage debts, the creditors began to pursue Susan for the accumulating debt, late fees, penalties, and interest. The automatic stay also prevented Marcus and Susan from listing and selling the marital home and the surrounding property. Finally, the automatic stay delayed Susan’s appeal and the reciprocal contempt proceedings.
¶ 13. The bankruptcy court confirmed Marcus’s bankruptcy plan in July 2011. Marcus was relieved of his mortgage obligations. But Susan was immediately responsible for the mortgage debt. In September 2011, while the contempt claims were pending, the chancellor entered an ex parte order in response to an ore tenus motion filed by Susan’s attorney. The chancellor stayed his earlier instruction that a special commissioner would sell the home to give Susan time to try to refinance the marital home and the surrounding property. The chancellor also ordered Marcus to sign a quitclaim deed related to the marital home and the surrounding property.
¶ 14. The chancellor heard Susan’s complaint for contempt and Marcus’s counter-complaint for contempt in October 2011. Marcus and Susan both testified. Additionally, Adam testified that he no longer lived with Susan. Ultimately, the chancellor declined to find Marcus or Susan in contempt. The chancellor held that Susan was still obligated to sell the marital home. Because Adam no longer lived with Susan, the chancellor reduced Marcus’s child-support obligation from $4,500 per month to $4,300 per month. But the chancellor declined to modify custody of Adam. Based on the events regarding the marital home and Marcus’s bankruptcy, the chancellor increased Marcus’s periodic-alimony obligation from $2,500 per month to $4,000 per month. The chancellor also ordered Marcus to pay Susan $30,000 to help alleviate some of the debt that had accrued on the mortgages, and to help her pay for counseling for two of the children. And because Marcus’s work schedule was certain and the initial visitation arrangement was not working, the chancellor established a specific visitation schedule. Susan later successfully moved to strike the chancellor’s requirement to sell the marital home and the surrounding property.
¶ 15. Marcus appeals. He claims the chancellor erred by: (1) declining to find Susan in contempt; (2) increasing Marcus’s alimony obligation from $2,500 per month to $4,000 per month; (3) awarding Susan $30,000 from his retirement; (4) declining to modify custody of Adam; and (5) declining to modify his child-support obligation more significantly than a decrease of $200 per month. Susan cross-appeals and claims the chancellor erred by: (1) declining to find Marcus in contempt for his failure to pay the mortgages; (2) declining to order Marcus to pay her *953 attorney’s fees; and (3) failing to consider all of Marcus’s income when determining his child-support obligation. Additionally, Susan requests that this Court award her attorney’s fees related to her appeal.
STANDARD OF REVIEW
¶ 16. An appellate court will not disturb a chancellor’s findings of fact when those findings are supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, or applied an erroneous legal standard. Rogillio v. Rogillio, 101 So.3d 150, 153 (¶ 11) (Miss.2012).
ANALYSIS
I. CONTEMPT

Sale of the Marital Home

¶ 17. Marcus argues that the chancellor should have found Susan in contempt for multiple reasons. First, Marcus claims the chancellor erred when he declined to find Susan in contempt for her failure to cooperate with the chancellor’s order to attempt to sell the marital home. The chancellor held:
The parties have accused each other of impeding the sale of the house. [Susan] says that [Mareusj’s bankruptcy stayed any possible sale on the house and property, and thus, she was unable to place the house and property for sale. In his bankruptcy, [Marcus] surrendered his interest and equity in the property, and discharged the associated debts. [Marcus] claims he tried to list the house with a realtor, but [Susan] prevented him from doing so, and [she] removed a “For Sale” sign he placed on the property. In light of the conflicting testimony by the parties, and the added complication of the bankruptcy, the Court will not hold either party in contempt at this time for failure to sell the house and property.
The chancellor added that Susan “must sell the house and acreage and must list them with a realtor immediately in order to get them sold.” Marcus argues that the chancellor should have found Susan in contempt for her efforts to thwart the sale of the marital home.
¶ 18. “Whether a party is in contempt is a question of fact to be decided on a case-by-case basis.” Gilliland v. Gilliland, 984 So.2d 364, 369 (¶ 19) (Miss.Ct.App.2008). “A chancellor has substantial discretion in deciding contempt matters because of the chancellor’s temporal and visual proximity to the litigants.” Id. at 369-70 (¶ 19). This Court “will not reverse the chancellor’s findings if they are supported by substantial credible evidence.” Doyle v. Doyle, 55 So.3d 1097, 1110 (¶ 44) (Miss.Ct.App.2010).
¶ 19. “A citation for contempt is proper when the contemner has willfully and deliberately ignored the order of the court.” Id. “The purpose of a civil contempt order is to coerce a partas] compliance with a court order.” Id. at (¶46). “The burden then shifts to the defendant who may rebut the prima facie case by proving inability to pay, lack of willfullness regarding the contempt, ambiguity in the order’s provisions, or impossibility of performance.” Id. at 1111 (¶ 46). “Civil contempt, such as here, must be proven by clear and convincing evidence.” Id.
¶ 20. Marcus claims that Susan ignored the chancellor’s order to attempt to sell the home, and “from the time the original divorce judgment was entered in October of 2010, until March of 2011, Susan refused to list the home and sought to thwart any sale at every turn.” In support of his claim, Marcus notes that Susan appealed the chancellor’s judgment ordering the sale of the home, and she attempted to *954 stay that portion of the chancellor’s judgment. Marcus characterizes Susan as having “little regard for whether ... either of them could afford the house and [she] did everything in her power to derail the sale of the home.”
¶ 21. Marcus testified that he and Susan “had multiple discussions on the phone ... about potentially selling the home. And on each occasion, she ... refused to cooperate, [and she] said she would fight me until her dying breath [over] selling] that home.” Marcus testified that in October 2010, he tried to talk to Susan about showing the home to a potential buyer, and Susan told him that if he “showed up with someone, ... she would meet [him] at the door with a shotgun if [he] was going to show the house.” Susan disputed Marcus’s testimony. According to her, she merely “asked him who it was and if [he] was financially able to afford the home, and [Marcus] couldn’t answer any of those questions, so that was the end of our conversation. He never asked me again.” Susan admitted that she threatened Marcus with a shotgun, but she claimed that her threat was not related to attempting to sell the home. In November 2010, Marcus again spoke to Susan about selling the home, but Susan again told him that she would fight to prevent the sale. Susan admitted that she told Marcus that she was not going to cooperate with him regarding the sale of the home. Susan told the chancellor that she and the children were upset over his decision. According to Marcus, Susan told him that if he was able to sell the home, she would move away so that he would not be able to see their children. During early 2011, Marcus put up “for sale” signs on the property twice. Marcus testified that “one [sign] didn’t last ten minutes” and the other sign “was pulled up by the next morning.” Susan admitted that she pulled up one sign, but she claimed that she did so because her thirteen-year-old son became upset when he saw it.
¶ 22. The chancellor’s decision to forego finding Susan in contempt was related to the fact that the stay associated with Marcus’s bankruptcy prevented the sale of the marital home and property. Susan admitted that she was unhappy with the chancellor’s decision to order the sale of the marital home and the surrounding property. Susan also admitted that she told Marcus that she would fight the sale of the marital home and property and she pulled at least one “for sale” sign out of the ground. But the chancellor could have justifiably held that Susan’s behavior did not merit finding her in contempt. Although. Susan was admittedly unsatisfied with the chancellor’s order to sell the marital home, her appeal of the chancellor’s decision should not be considered contemptuous in and of itself. And we do not find that there was clear and convincing evidence that Susan prevented a potential buyer from viewing the marital home or the surrounding property. It is noteworthy that the chancellor declined to find either Susan or Marcus in contempt. There was substantial evidence to support the chancellor’s decision, which was not an abuse of his substantial discretion. Consequently, we do not disturb the chancellor’s decision.

Division of Personal Property

¶ 28. Next, Marcus claims that the chancellor should have found Susan in contempt for her refusal to divide their personal property according to their agreement and the judgment of divorce. Specifically, the judgment of divorce awarded Marcus the following personal property: (1) his personal effects and jewelry; (2) the items in his present home; (3) the 2006 Nissan Altima; (4) a televi *955 sion that he removed from the marital home; and (5) his hunting gear and the guns he had received as gifts. Susan received “[a]ll remaining items not specified as belonging to [Marcus] ..., including, but not limited to, all other vehicles and household furnishings.” However, the judgment of divorce later inconsistently provided:
For all items not specifically divided, the Court directs that [Susan] prepare two lists dividing the property in equal shares and submit the lists to [Marcus] for his consideration. If [Marcus] believes [Susan] left items off the lists, then [Marcus] is directed to divide the remaining items in two' lists, and submit his lists to [Susan]. [Marcus] shall choose from [Susan’s] lists and [Susan] from [Marcus’s]. Presumably, this method would cause an equal division of the personal property.
¶ 24. During the hearing on his complaint for contempt, Marcus testified:
[T]here’s several items that [Susan has] refused [to give me]. There — I have some personal property, some momentos from my father, my family of origin. It was in a box up in the attic in storage that I failed to get when I initially moved out, and she called me and attempted to sell those to me, among other things that she tried to sell me that should be my property.
Marcus also claimed that Susan should have given him a tractor. Finally, Marcus testified that Susan refused to follow the chancellor’s order “to make a list of miscellaneous items and for me to make a list, and we were to get together and compare those lists and items and divide them up equally .... ” Susan argues that the judgment of divorce awarded her all personal property that was not specifically awarded to Marcus, and Marcus received everything that was listed. Susan reasons that Marcus was not entitled to any other personal property.
¶ 25. Under the “facts” portion of the chancellor’s October 2011 judgment, the chancellor noted that Susan “was to return several pieces of [Marcus’s] personal property to him, including family photo albums and a china cabinet. [But Susan] has not returned all of these items to [Marcus.]” However, under the “conclusions of law” portion of the chancellor’s October 2011 judgment, the chancellor held that Marcus’s “requests] for the tractor and equipment and personal property are denied.” Although, the chancellor did not explicitly order Susan to give Marcus his family photo albums, the chancellor declined to disturb the portion of the judgment of divorce that awarded Marcus his “personal effects.” And the chancellor did not relieve Susan of her obligation to “return several pieces of [Marcus’s] personal property to him, including family photo albums and a china cabinet.” But based on the fact that the judgment of divorce contained inconsistent statements regarding property division, it was within the chancellor’s discretion to decline to find Susan in contempt. We do not disturb the chancellor’s decision.

Visitation

¶ 26. Next, Marcus claims the chancellor erred by declining to find Susan in contempt for interfering with his visitation with the children. The chancellor initially held that because Marcus’s work schedule was uncertain, Marcus was to submit a written request for visitation fifteen days “in advance of potential days for visitation and, absent a conflict with schooling or previously arranged schedules involving the children, [Susan] will confirm the visitation in writing.” According to Marcus, he submitted twenty-four requests for visitation to Susan, who only replied six times. Marcus argues that Su *956 san left him in limbo regarding whether he would receive his requested visitation with the children.
¶ 27. Susan argues that Marcus is to blame for his problems with visitation because he did not notify her regarding the times that he planned to pick up or drop off the children. Susan notes that she complied with eighteen of Marcus’s twenty-four written requests for visitation. And five of the six times that she refused Marcus’s requests, she responded to him in writing and explained that she or the children had conflicts with Marcus’s requested visitation. Susan also notes that when she refused Marcus’s visitation requests, she submitted alternative times for visitation.
¶ 28. There was testimony that Susan used Marcus’s requests for visitation as leverage to demand additional money from Marcus. There was also evidence that Susan obstructed Marcus’s access to the children by way of telephone calls or text messages. However, the chancellor rectified those problems in his October 2011 judgment. The chancellor also established a concrete schedule for Marcus’s visitation. Because the chancellor resolved the uncertainty regarding Marcus’s visitation, we find that the chancellor did not abuse his discretion when he declined to find Susan in contempt for interfering with Marcus’s visitation.
¶ 29. Having found that the chancellor acted within his discretion when he declined to find Susan in contempt for any of the reasons that Marcus raises on appeal, we find no merit to this issue.
II. ALIMONY
¶ 30. Marcus claims the chancellor erred when he increased Marcus’s alimony obligation from $2,500 per month to $4,000 per month. According to Marcus, the chancellor “completely disregarded Susan’s role in the situation.” Marcus further argues that the chancellor erred when he did not analyze the factors discussed in Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss.1993), to determine whether it was appropriate to increase Marcus’s alimony obligation.
¶ 31. “Alimony may be modified upon a showing that there has been a material and unanticipated change in circumstances.” D'Avignon v. D'Avignon, 945 So.2d 401, 406 (¶ 15) (Miss.Ct.App.2006). “The material change must occur as a result of after-arising circumstances of the parties not reasonably anticipated at the time of the agreement.” Id.
¶ 32. Marcus cites Jones v. Jones, 917 So.2d 95, 101 (¶ 19) (Miss.Ct.App.2005), for the principle that when a chancellor finds a material change of circumstances that justifies an increase in alimony, the “chancellor must also compare the relative positions of the parties at the time of the request for modification in relation to their positions at the time of the divorce decree.” While Marcus is correct, the Mississippi Supreme Court has held that an appellate court may find that a chancellor implicitly conducted an Armstrong analysis. “While not making specific findings of fact in the record as to the Armstrong factors, the chancellor did consider the position of the parties at the time of the divorce decree in relation to their positions at the time of the trial for modification.” Anderson v. Anderson, 692 So.2d 65, 71 (Miss.1997). “This Court is charged with reviewing the entire record.” Id. “Evidence that supports or reasonably tends to support the findings of fact below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court’s finding of fact, must be accepted.” Id. at 72. “As to issues of fact where no specific findings *957 have been articulated by the chancellor, [an appellate court] proceeds upon the assumption that the chancellor resolved all such fact issues in favor of the appellee.” Id. “While the chancellor may not have made specific findings of fact in his opinion, he heard all the testimony and viewed all of the evidence. His findings on the record suggest[ ] that he considered all of the Armstrong factors and the entire circumstances of the parties before rendering his decision.” Id.
¶ 33. The chancellor held that “[Marcus’s] bankruptcy and discharge of the debts constitute^] a material change. This discharge is significant, in that all payments on the mortgages, which were [Marcus’s] responsibility, are now [Susan’s]. This has resulted in an increase in her expenses by over $5,000 monthly.” Additionally, the chancellor stated that Marcus’s “bankruptcy has resulted in a great financial hardship on [Susan] and a great financial disparity between the parties, frustrating the clear .goal of this Court.” Furthermore, the chancellor’s October 2011 judgment and the accompanying opinion are very thorough and detailed. Consequently, we find that the chancellor considered Marcus’s and Susan’s financial positions when he increased Marcus’s alimony obligation. Suffice it to say, we find that the chancellor implicitly considered a number of the Armstrong factors. It follows that we find no error in the chancellor’s decision to modify Marcus’s periodic-alimony obligation.
III. LUMP-SUM TRANSFER
¶ 34. Marcus claims the chancellor erred when he awarded Susan $30,000 from Marcus’s LPL Financial account. The chancellor held that Marcus’s “bankruptcy and discharge of his debt on the marital home and property frustrated the ... equitable distribution” of the marital estate. The chancellor ordered Marcus to transfer $30,000 to Susan because Marcus’s bankruptcy and the discharge of his obligations resulted in a “disparity in the parties’ financial standings.” Additionally, the chancellor stated that the transfer “may enable [Susan] to pay off the arrears on the marital home and property” that accrued due to Marcus’s bankruptcy. According to Marcus, the chancellor “simply ignored Susan’s actions that [led] to both her and Marcus’[s] predicament.” Marcus also claims that his earnings were solely responsible for “the marital estate in the first place.”
¶35. Marcus’s argument under this heading was combined with his argument regarding the chancellor’s decision to increase his alimony obligation. Although Marcus cited authority to support his argument that the chancellor erred when he increased Marcus’s alimony obligation, Marcus cited no authority to support his argument that the chancellor erred when he ordered Marcus to pay Susan an additional $30,000 from his LPL Financial account. A party’s “[fjailure to cite any authority is a procedural bar, and this Court is under no obligation to consider the assignment.” Taylor v. Kennedy, 914 So.2d 1260, 1262 (¶ 4) (Miss.Ct.App.2005). Because Marcus cited no authority to support this argument, it is procedurally barred.
IV. CUSTODY MODIFICATION
¶ 36. Next, Marcus claims the chancellor erred when he declined to modify custody of Adam, who was eighteen years old at the time of the hearing. Marcus characterizes the chancellor’s decision as “astonishing” and “bizarre.” The chancellor found that Adam “moved out of the marital residence and moved in with [Marcus] for about three months.” The chancellor also noted that “Adam now lives *958 primarily with his maternal grandmother and stays with [Marcus] from time to time.” According to the chancellor, “Adam’s circumstances have changed materially, but [the change is] not adverse.”
¶ 37. “When seeking to modify custody of a child, a non-custodial party must prove that: (1) there has been a substantial change in circumstances affecting the child; (2) the change adversely affects the child’s welfare; and (8) a change in custody is in the best interest of the child.” T.K. v. H.K., 24 So.3d 1055, 1062 (¶ 22) (Miss.Ct.App.2010). “Furthermore, it is well settled that the polestar consideration in any child custody matter is the best interest and welfare of the child.” Id. “Modification of a child custody order must be based on conduct of the custodial parent that poses a danger to the mental or emotional health of the child.” Id. at (¶ 28). “In determining whether a material change in circumstances has occurred, the chancellor must consider the totality of the circumstances.” Id. Resolution of factual disputes is always a matter entrusted to the sound discretion of the chancellor. Carter v. Carter, 735 So.2d 1109, 1114 (¶ 19) (Miss.Ct.App.1999).
¶ 38. Adam testified that he left Susan’s home because he and Susan “kind of got in an argument” and they “weren’t getting along.” Adam also testified that Susan called the police on him, but the record is not clear regarding why she did so. A police officer drove Adam to school the day that he left Susan’s house. Adam also testified that Susan would not let him take a vehicle when he left her house. Adam testified that he would spend the night with his grandmother because his job was in Starkville and his grandmother lived in Starkville, so “it was just easier that way.” According to Adam, Marcus supported him, but he ate the majority of his meals at his grandmother’s house. When the chancellor asked Adam where he lived, Adam responded that he lived with Marcus.
¶ 39. We agree that there had been a material change in Adam’s circumstances. While reasonable minds could disagree whether Adam’s leaving Susan’s home based on tension between them was adverse to Adam’s best interest, it was within the chancellor’s discretion to find that it was not. Adam was a full-time college student at the time of the hearing. It is unclear whether Adam chose to leave Susan’s home, or whether Susan forced him out of the home. There is certainly no clear evidence that Susan forced him out. When Adam testified, he was not critical of Susan. Based on the totality of the circumstances, we find that the chancellor did not abuse his discretion. It follows that we find no merit to this issue.
V. CHILD SUPPORT
¶ 40. Marcus claims that the chancellor erred when he only decreased Marcus’s child-support obligation from $4,500 per month to $4,300 per month. The chancellor held:
Given that both parties claim to be providing financial support directly to Adam now that he lives with his grandmother, there should be a small decrease in the [amount of child support] originally set by the Court. Additionally, there were a few months when Adam lived with [Marcus], after Adam moved out of the marital home. [Susan] is probably now paying less of Adam’s daily living expenses than she was previously. Therefore, the Court directs that the monthly child support will be $4,300 monthly, a decrease from $4,500.
This is an upward departure from the statutory amount. [Marcus] earns well over $50,000 annually, which requires a written finding by the Court as to the *959 appropriateness of the application of the guidelines. The Court finds this award of $4,300 to be appropriate for the four sons living with [Susan], given the lifestyle to which the boys are accustomed. This award will still leave [Marcus] with an ample monthly budget for his own living expenses.
A chancellor may modify child support if there has been “a substantial or material change in the circumstances of one or more of the interested parties: the father, the mother, and the child or children, arising subsequent to the entry of the decree to be modified.” Garcia v. Garcia, 97 So.3d 109, 112 (¶ 12) (Miss.Ct.App.2012) (quoting Edmonds v. Edmonds, 935 So.2d 980, 987 (¶ 19) (Miss.2006)). We will reverse a chancellor’s decision to modify child support if the chancellor abused his discretion. Moulds v. Bradley, 791 So.2d 220, 226 (¶ 14) (Miss.2001).
¶ 41. In Mississippi, an award of child support is governed by Mississippi Code Annotated section 43-19-101 (Supp. 2013). The guidelines establish that there is a rebuttable presumption that an award of child support should be twenty-four percent of the noncustodial parent’s adjusted gross income when four children are due support. Miss.Code Ann. § 43-19-101(1). A chancellor may deviate from the statutory guidelines if he makes “an on-the-record finding that it would be unjust or inappropriate to apply the guidelines in the instant case.” Garcia, 97 So.3d at 112 (¶ 12) (quoting Chesney v. Chesney, 910 So.2d 1057, 1061 (¶ 7) (Miss.2005)).
¶ 42. The chancellor held that an upward deviation of Marcus’s child-support obligation was warranted given the lifestyle to which the four boys living with Susan were accustomed. Marcus cites no authority to suggest that the chancellor erred. We find no merit to this issue.
CROSS-APPEAL
I. CONTEMPT
¶ 43. Susan claims the chancellor should have found Marcus in contempt for his failure to pay the mortgage debts. As we discussed above, “[w]hether a party is in contempt is a question of fact to be decided on a case-by-case basis.” Gilliland, 984 So.2d at 369 (¶ 19). “A chancellor has substantial discretion in deciding contempt matters because of the chancellor’s temporal and visual proximity to the litigants.” Id. at 369-70 (¶ 19). This Court “will not reverse the chancellor’s findings if they are supported by substantial credible evidence.” Doyle, 55 So.3d at 1110 (¶ 44).
¶ 44. “A citation for contempt is proper when the contemner has willfully and deliberately ignored the order of the court.” Id. “The purpose of a civil contempt order is to coerce a part[y’s] compliance with a court order.” Id. at (1146). “A payor’s failure to comply with a court order is prima facie evidence of contempt.” Id. at 1111 (¶ 46). “The burden then shifts to the defendant who may rebut the prima facie case by proving inability to pay, lack of willfullness regarding the contempt, ambiguity in the order’s provisions, or impossibility of performance.” Id. “Civil contempt, such as here, must be proven by clear and convincing evidence.” Id. “[T]he payor must prove the inability to pay with [particularity] and not in general terms.” Id. at (¶ 47).
¶ 45. The chancellor heard Marcus’s testimony that he could not afford to pay the mortgages in addition to all of his other court-ordered obligations. Additionally, the chancellor heard testimony that Susan obstructed or at least frustrated Marcus’s attempts to sell the marital home or list it with a realtor. It was within the chancellor’s discretion to decline to find *960 Marcus or Susan in contempt — especially considering the evidence that neither party had strictly obeyed the chancellor’s initial judgment. We find no merit to this issue.
II. ATTORNEY’S FEES
¶ 46. Next, Susan claims the chancellor should have ordered Marcus to pay her attorney’s fees because Marcus was in contempt. Because we have found no merit to Susan’s claim that the chancellor erred when he declined to find Marcus in contempt, we find no merit to this issue.
III. MARCUS’S INCOME
¶ 47. Susan claims the chancellor erred when he did not order Marcus to pay more than $4,300 in monthly child support. According to Susan, the chancellor did not consider all of Marcus’s income when determining his child-support obligation. Susan’s argument is based on the concept that Marcus earned more money in 2010 than he did in 2011. However, Marcus testified that he worked additional shifts during 2010 so that he would be able to meet all of his court-ordered obligations. Marcus also testified that working so many additional shifts was detrimental to his own health, and given that he works as a physician, the danger of fatigue posed a threat to the well-being of his patients. Susan is correct that the term “adjusted gross income” includes “all potential sources that may reasonably be expected to be available to the absent parent.” Miss.Code Ann. § 43-19-101 (3)(a). Even so, it was within the chancellor’s discretion to find that Marcus’s adjusted gross income should not be calculated based on an earning potential that Marcus could only realize by placing his patients in potential danger. We find no merit to this issue.
IV. ATTORNEY’S FEES ON APPEAL
¶ 48. Finally, Susan requests that this Court award her attorney’s fees related to her appeal. “We have generally awarded attorney’s fees on appeal in the amount of one-half of what was awarded in the lower court.” McDonald v. McDonald, 69 So.3d 61, 68 (¶ 17) (Miss.Ct.App.2011). However, the chancellor did not award Susan any attorney’s fees. And we have found no merit to Susan’s claim that the chancellor erred by declining her request for attorney’s fees. It follows that we do not award her attorney’s fees on appeal.
¶ 49. THE JUDGMENT OF THE OK-TIBBEHA COUNTY CHANCERY COURT IS AFFIRMED ON DIRECT AND CROSS-APPEAL. ALL COSTS OF THIS APPEAL ARE ASSESSED EQUALLY BETWEEN THE APPELLANT/CROSS-APPELLEE AND THE APPELLEE/CROSS-APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. JAMES, J„ CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. BARNES, J., NOT PARTICIPATING.

. Marcus and Susan’s six sons are Kevin (born 1987), Adam (1992), Josh (1997), Casey (2001), Jacob (2003), and Justin (2007). Kevin was emancipated when Marcus and Susan divorced.

. The record indicates that Susan worked some as a cook for a hunting club, and she "flipped” at least one house.