# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-01683-COA

KATE DAVIS                                                                    APPELLANT

v.

MAX DAVIS                                                                       APPELLEE

DATE OF JUDGMENT:               08/19/2019
TRIAL JUDGE:                    HON. DEBORAH J. GAMBRELL
COURT FROM WHICH APPEALED:      LAMAR COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:         MARY HOLLY HAMMETT
ATTORNEY FOR APPELLEE:          SHAWN M. LOWREY
NATURE OF THE CASE:             CIVIL - CUSTODY
DISPOSITION:                    AFFIRMED IN PART; REVERSED AND
                                RENDERED IN PART - 02/22/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE WILSON, P.J., WESTBROOKS AND McCARTY, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.     In their divorce decree, Max Davis and Kate Davis were granted joint physical and

legal custody of their daughter, Danielle.[1]  Subsequently, Max and Kate filed competing

complaints for modification of custody.  After a trial, the chancellor granted Max's request

for modification and awarded him custody of Danielle.  The chancellor found that Kate had

falsely accused Max of abusing Danielle and had attempted to interfere with Max's parental

rights by pursuing paternity testing in an effort to show that another man was Danielle's

biological father.  Based on those findings, the chancellor found that there had been a

---

[1] In order to protect the privacy and anonymity of the minor child, fictitious names
are used for the parties, the minor child, and her alleged biological father.

material change in circumstances that adversely affected Danielle. The chancellor also found that a modification of custody would be in Danielle's best interest. Finally, the chancellor ordered Kate to reimburse Max for attorney's fees he incurred in defending against the abuse allegations. Kate appealed.

¶2.     We reverse and render the modification of custody. Although the chancellor found that Kate did not prove her allegation of abuse, there is no evidence that Kate concocted the allegation or coached Danielle to make the allegation. Rather, Danielle disclosed to Kate that Max had abused her, and Danielle later repeated the allegation during a forensic interview. Moreover, although the forensic interviewer opined at trial that no abuse had occurred, a child-family protection specialist with the Department of Child Protection Services testified that she believed Danielle had been abused based on the consistency of her allegations. Under the circumstances, the record does not support the chancellor's finding that there was no "rational evidence" for Kate's allegation of abuse. In addition, the results of the paternity test were never disclosed to Danielle, and there is no evidence that Danielle was adversely affected by either Kate's disclosure of the abuse allegation or the paternity test. Accordingly, there was no basis for a modification of custody, and the parties should return to the joint custody arrangement set forth in their original divorce decree. We also reverse and render the award of attorney's fees because the record does not support the chancellor's finding that there was no basis for the abuse allegation. We affirm the chancellor's denial of Kate's complaint for modification of custody.

### FACTS AND PROCEDURAL HISTORY

2

¶3. Kate and Max Davis married in 2014 and had one daughter, Danielle, born later that year. In 2017, the Davises separated, and Kate filed for a divorce. They later agreed to a divorce based on irreconcilable differences and stipulated that the chancellor would decide custody of Danielle. In July 2018, the chancellor awarded the Davises joint legal and physical custody, with physical custody to rotate on a weekly basis.

¶4. In September 2018, Kate noticed some small bruises around Danielle's biceps, and Danielle told Kate that Max had "jerked her around." In October 2018, Danielle returned from Max's home with slight bruising under her eye. When Kate asked Danielle about her eye, Danielle stated that Max had struck her in the eye. Kate met with a Lamar County Sheriff's deputy and filed a request for charges of felonious child abuse with the Lamar County Sheriff's Department, claiming that Max had abused Danielle.

¶5. On October 21, 2018, Max was arrested on one charge of misdemeanor child abuse and one charge of felony child abuse. Kate had filed affidavits with the Lamar County Justice Court alleging that Max had abused Danielle by "grabbing both her arms and jerking her back and forth," in violation of Mississippi Code Annotated section 97-5-39(1)(a) (Rev. 2014), and by "striking [Danielle] . . . in the face, causing her to have a black eye," in violation of section 97-5-39(2)(b)(ii). The Lamar County Justice Court entered a protection order prohibiting Max from having custody of Danielle. Following an initial appearance, the misdemeanor charge was passed to the file, meaning that it was not pursued further, and the felony charge was dismissed for lack of evidence.

¶6. On October 25, 2018, Max filed a complaint for modification of custody and to hold

Kate in contempt of court. Max alleged that Kate had denied him custody of Danielle and had falsely accused him of abuse. He also alleged that Kate had told him that he was not Danielle's father. Max's complaint attached a copy of medical records from Danielle's emergency room visit following the alleged abuse. The records indicate that Danielle had a "minimal" black or swollen eye. Doctors did not note any suspected abuse. Max asked the chancellor to award him attorney's fees for his defense of the abuse allegations.

¶7.     Kate also filed a complaint for modification of custody. She alleged that Max had abused Danielle, that a material change of circumstances had occurred, and that Danielle needed to be protected from irreparable harm. Kate also sought a temporary restraining order against Max and an emergency order granting her custody.

¶8.     The chancellor appointed a guardian ad litem (GAL) to investigate the allegations of abuse and to make a recommendation as to the best interest of the child.[2] The chancellor also entered a temporary order reinstating the joint custody provisions of the July 2018 divorce decree, overriding the justice court's protection order.

¶9.     Following a May 31, 2019 status hearing, the chancellor entered an order prohibiting any contact between Danielle and a man named Ted Greene and prohibiting the parties from discussing the identity of Danielle's biological father with Danielle. The chancellor also

---

[2] The original chancellor in this case, Judge Ronald Doleac, appointed a GAL and made the initial custody determination, awarding joint physical and legal custody to Kate and Max. Judge Doleac retired at the end of 2018, and the case was reassigned to Judge Chad Smith. The original GAL withdrew from the case after she became Judge Smith's law clerk. Judge Smith appointed a new GAL and then recused himself due to his law clerk's previous involvement in the case. The case was then reassigned to Judge Deborah Gambrell.

4

temporarily modified custody to give Max sole physical custody and Kate visitation.

¶10. At trial, Officer Lance Emfinger of the Lamar County Sheriff's Department testified that he had met with Kate about filing abuse charges on October 15, 2018. Kate showed him a photo of Danielle with some slight bruising around Danielle's eye. Emfinger testified that he told Kate that the possible injury probably would not support a felony charge but might support a misdemeanor charge. He explained the process for filing felony charges against Max and told her that Danielle would have to undergo a forensic interview if she wanted to pursue felony charges. Emfinger did not refer the case to the local child advocacy center (CAC) because he did not see any injury consistent with felony child abuse. The next day, Emfinger received a call from the CAC about a forensic interview of Danielle. He did not attend the interview because he was not scheduled to work that day and had not received sufficient notice of the interview.

¶11. Emfinger testified that he did not know until trial that Max had been charged with a felony. Emfinger testified that Max had been accused of abuse on prior occasions, but Emfinger had no personal knowledge of the prior allegations, and none of the prior allegations resulted in criminal charges.

¶12. Max testified that after the chancellor awarded joint custody in July 2018, Kate refused to deliver Danielle to him or was late delivering Danielle to him on several occasions. The day Max was arrested on the abuse charges, he was getting ready to meet Kate for a custody exchange when an officer knocked on the door of his home. Max was handcuffed and taken to jail. He testified that the misdemeanor charge was passed to the file

for lack of evidence and that the felony charge was dismissed after a preliminary hearing. He did not see Danielle for about a month after his arrest. Max denied ever hitting Danielle.

¶13. Max explained that Danielle had gotten a slight black eye while jumping on a trampoline with some other children. Max said that another child's shoulder or elbow hit Danielle in the face while they were jumping. He did not actually see the incident and did not notice the bruise until that evening. He did not seek medical attention or tell Kate because the injury was minor.

¶14. Max testified that he spent little time with Danielle on the day that he allegedly bruised her arm. On that day, Max's mother kept Danielle while Max was at a job interview, and Kate took Danielle to dance before returning her to Max. Kate initially refused to return Danielle as agreed, and Max called a police officer. The officer arrived at the meeting place around the same time as Kate. Kate did not mention any bruises to Max or the officer. When Kate did ask about the bruises several days later, Max told her that he did not know anything about them.

¶15. Max testified that he had never abused Danielle and that the Department of Child Protection Services (DCPS) had never investigated him prior to Kate's allegations. Max noted that Kate had never made any allegation of abuse during their divorce proceedings and that he had never been arrested before. Max testified that he had personally cared for Danielle during his periods of custody and that he was capable of caring for her if he were awarded sole physical custody. Max was in the process of looking for a preschool for Danielle. He did not want Danielle to attend the Head Start program in which Kate had

6

enrolled her because it was over an hour away from his house.

¶16.    Robin Bixler, a forensic interviewer with the CAC, testified about her October 2018 forensic interview with Danielle.  Bixler stated that a forensic interview is a neutral, non-biased fact-finding interview regarding a possible negative experience.  Her interview with Danielle was recorded and viewed by others through a one-way window.  DCPS asked Bixler to conduct an interview regarding Danielle's black eye.  Bixler testified that Danielle was energetic, happy, and healthy.  Bixler was asked if Danielle had disclosed any abuse to her, but the chancellor sustained a hearsay objection.  Bixler testified that the recording of the interview would show Danielle's disclosures.  The chancellor asked Bixler if the black eye appeared to be abuse, and Bixler said that it looked more like an accident than abuse.  The chancellor asked Bixler for her "professional opinion" about the case, and Bixler stated that her opinion was "[t]hat there was no abuse."  However, Bixler also testified that Danielle's responses to questions during her interview were consistent with a child who may have been physically abused.

¶17.    Bixler said that after she interviewed Danielle, she gave her report to DCPS.  Bixler testified that she did not tell DCPS that Danielle had not been abused.  Rather, she gave DCPS a summary of Danielle's statements for further investigation.

¶18.    Torjia Ashford, a child-family protection specialist with the Lamar County DCPS, testified that she spoke with Danielle and Kate at DCPS's office on October 16, 2018, after Kate called the DCPS hotline to report the alleged abuse.  When Ashford met with Danielle and Kate, she spoke to Danielle about the injury to her eye.  Based on Danielle's answers,

7

Ashford recommended that Danielle undergo a forensic interview. Ashford advised Kate to file charges and seek medical treatment for the injury. Ashford watched the forensic interview but did not participate. Ashford testified that Danielle made the same disclosures of abuse during the interview that she had made to Ashford.

¶19. Ashford testified that she viewed bruises on Danielle's thighs and upper arm. She testified that Danielle told her that Max had grabbed her and shaken her. Ashford thought that Danielle seemed afraid of Max. Danielle told Ashford that Max did not like her and that she did not like Max. Ashford testified that she "substantiated" the abuse allegations after observing the forensic interview. She explained that Danielle was consistent in her story, which indicated to her that Danielle was telling the truth.

¶20. Ashford testified that Danielle told Bixler during the interview that Max had shot "Nonna" in the arm while Danielle was hiding from Max in the closet. There was no evidence that any such incident occurred. Ashford testified that she ultimately closed her investigation of the case without taking any further actions because she felt that Kate was taking the necessary steps to keep Danielle safe. Ashford knew that there was a protection order in place and that Kate had initiated criminal charges against Max.

¶21. Marguerite DeLeon worked as a family advocate at the CAC and had prepared a report on Danielle's interview. She observed the interview but did not participate. Before the interview, DeLeon took statements from Kate about the abuse, and she documented the statements made by Danielle during the interview. DeLeon explained that after the CAC conducts an interview and prepares a report, they give that information to law enforcement

and DCPS for further investigation. DeLeon did not state whether she believed Danielle's disclosures of abuse were credible.

¶22. During the trial, Kate's attorney requested that the chancellor watch the video of Danielle's forensic interview. However, the chancellor declined to watch the video, stating, "Why do I need to view a video when the person who did the exam [(i.e., Bixler)] just said in her professional opinion there is no abuse?" Later, Ashford testified that she believed that a review of the video would be helpful to the court in reaching a decision. However, the chancellor stated that based on her experience as an attorney and a judge, she could "make a determination as to abuse . . . without looking at a tape." Kate failed to make a proffer of the video, so it is not in the record on appeal.

¶23. Kate's father testified that he was present when Danielle returned home with a bruised eye. He asked her what happened, and based on her response, he encouraged Kate to report it. He testified that he had also seen bruising on the inside of Danielle's arm that looked like fingermarks. He was concerned about the black eye and the bruising on her arm, but he did not seek medical treatment for Danielle. He acknowledged that Danielle sometimes suffered small injuries while in Kate's care. He also testified that after the divorce, Kate told him that Max had hit her.

¶24. Kate's close friend Jennifer also testified that she saw Danielle's black eye. Kate told Jennifer that Danielle said that Max had hit her, and Jennifer urged Kate to take Danielle to the hospital. Jennifer also testified about Kate's relationship with Ted Greene. Jennifer did not believe that Kate was dating Greene. Jennifer testified that Kate decided to get a

9

paternity test because she had doubts that Max was Danielle's father.

¶25. Kate testified that she believed that Danielle had been abused by Max because she had no reason to doubt what her daughter told her. She had asked the court to modify custody because she was concerned for Danielle's safety. She stated that she would not have agreed to joint custody if she had thought Danielle's safety was at risk. She testified that after the forensic interview, DCPS and law enforcement told her that her allegations were under investigation. She testified that she would not subject her child to a forensic interview or waste the court's time if she did not believe Danielle's allegations. When she pursued felony charges against Max, she knew that the charges could result in his imprisonment. Nonetheless, she decided to pursue charges after hearing Danielle's disclosures during the forensic interview. Kate testified that it was her intent to protect Danielle, not to ruin Max's life.

¶26. Kate testified that she decided to pursue DNA testing to determine whether Ted Greene was Danielle's father only because she believed that Danielle had been abused and "felt like nobody was listening to [Danielle]." Kate testified that she was trying "to protect" Danielle from abuse and "felt . . . like [she] didn't have another option to help [Danielle]." Kate said that during their marriage, Max had stated multiple times "that he would not raise somebody else's child," so she thought that she could help Danielle by proving that Max was not her father. However, Kate testified that she regretted her decision after she received the test results and that she had not wanted to share the results with Max. According to Kate, she did not want Danielle to know about the test results either, and she denied that she ever told

10

Danielle that Greene was her father. Kate admitted that she invited Greene to Danielle's dance recital, but she testified that she only told Danielle that Greene was a friend from high school. Kate also admitted that Danielle took a photo with Greene at the recital.

¶27. The GAL testified and his report was admitted as evidence. The GAL noted that he had seen the photos of Danielle's black eye and could see that she had been injured, but he did not think it appeared that a "grown man" had punched her. The GAL interviewed Ashford and noted that her belief that Danielle had been abused was inconsistent with her decision to close the case. The GAL testified that when he met with Kate, she was vague about the abuse allegations and instead wanted to complain about Max's parenting decisions—e.g., allowing Danielle to eat fast food and play at dirty playgrounds. Kate could not elaborate on the abuse allegations beyond the fact that Danielle said Max had hit her in the eye and that Kate had noticed bruises and scratches on Danielle. The GAL did not think that any of the bruising or scratches looked abnormal for an active young child, and he did not believe that Danielle had been abused. The GAL wrote, "The behavior of an abuser is generally much more evident than a one-time incident, and Kate could not articulate anything of substance regarding abuse of herself or her child." Kate told the GAL that Max had punched a wall, hit her in the stomach while pregnant, and committed various other assaults. However, the GAL discounted these allegations because Kate could not "give [him] details" or "provide a detailed narrative" of any of the incidents.

¶28. The GAL was "appalled" that Kate had obtained a paternity test that showed that Greene was likely Danielle's father and then introduced Danielle to Greene. The GAL noted

11

that Greene had changed his Facebook profile photo to a photo of him and Danielle and that Greene had posted on Facebook that Danielle was his daughter. The GAL concluded it was "abundantly clear" that Kate had pursued DNA testing to prove Max was not the father and to "win" their custody dispute.

¶29. The GAL's report confirmed that Danielle had stated during her forensic interview that Max punched her. However, Danielle also said that Max had shot "Nonna" and had stabbed Danielle with a fork with a monster on the end of it. There was no other evidence that Max had shot anyone or stabbed Danielle with a fork. The GAL also noted that Danielle was happy and outgoing when he met with her.

¶30. The GAL concluded that Kate was willing to disregard Danielle's best interest in order to get full custody and that no evidence existed to corroborate Danielle's allegations of abuse. The GAL was "disgusted" by Kate's behavior and her need to "win" at all costs. He recommended that Max be given sole legal and physical custody.

¶31. In August 2019, the chancellor entered a final order on the competing petitions for modification. The chancellor found that Kate's pursuit of criminal charges and a custody modification were done "to the detriment of her child, without care, nor attention as to the best interest of her child." The chancellor found that this "behavior [was] sufficient to amount to a material change in [circumstances] for the court to modify custody[.]" The chancellor also found that Kate sought to identify Greene as Danielle's father when "Kate realized that she lacked evidence to support her position" on the abuse claims. The chancellor found that Kate had chosen to harm her daughter emotionally "instead of

12

accepting the evidence that Max had not abused [Danielle]." The chancellor found that this was an "intentional interference with [Max's] parental rights" and "another basis for [finding] a material change in circumstances."

¶32. The chancellor next applied the *Albright*[3] factors and determined that Max should have sole legal and physical custody of Danielle, while Kate should receive visitation. The chancellor also ordered Kate to pay attorney's fees of $12,204.50 that Max had incurred in defending against allegations of abuse. This amount included the remaining balance of Max's bill for his criminal defense and a portion of his attorney's fees in the modification proceeding. Kate filed a motion for a new trial or to alter or amend the judgment, which was denied, and a notice of appeal.

**ANALYSIS**

¶33. On appeal, Kate raises five issues. She argues (1) that the chancellor erred by not watching the recording of Danielle's forensic interview, in which Danielle disclosed the alleged abuse; (2) that the chancery court lacked jurisdiction to hear allegations of abuse that were the subject of a DCPS investigation; (3) that the chancellor erred by modifying custody because Max failed to prove a material change in circumstances; (4) that the modification of custody was not in Danielle's best interest; and (5) that the chancellor erred by awarding attorney's fees.

¶34. After review, we conclude that Max failed to prove a material change in circumstances. Therefore, we reverse and render the modification of custody. We also

---

[3] *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

13

affirm the chancellor's denial of Kate's request to modify custody. Therefore, the parties shall have joint legal and physical custody of Danielle pursuant to the terms of their July 2018 divorce decree. In addition, although the chancellor ultimately found that Kate failed to prove her allegations of abuse, those allegations were not "completely unfounded," as would be required to justify an award of attorney's fees. Miss. Code Ann. § 93-5-24(9)(c) (Rev. 2018). Therefore, we also reverse and render the award of attorney's fees. Based on our disposition of the case, it is unnecessary to address Kate's remaining arguments regarding Danielle's forensic interview and the chancellor's *Albright* analysis.

## I. The chancery court had jurisdiction over this matter.

¶35. Kate argues that a chancery court lacks jurisdiction "to hear allegations of abuse that are investigated and substantiated [by DCPS] prior to the [filing] of the chancery court complaint." Kate argues that the chancellor was required to "certify" the allegations of abuse to the youth court for a final determination. She also argues that even if the chancery court had jurisdiction to proceed, the chancellor was required to adhere to the Uniform Rules of Youth Court Practice.

¶36. Mississippi Code Annotated section 43-21-151 provides that "[t]he youth court shall have exclusive original jurisdiction in all proceedings concerning . . . an abused child . . . *except*," among other exceptions, "[w]hen a charge of abuse of a child first arises in the course of a custody action between the parents of the child already pending in the chancery court and no notice of such abuse was provided prior to such chancery proceedings[.]" Miss. Code Ann. § 43-21-151(1)(c) (Rev. 2015) (emphasis added); *accord* Miss. Code Ann. §§ 93-

14

5-23 & 93-11-65(4) (Rev. 2018). When a charge of abuse arises during a custody action in chancery court, "the chancery court may proceed with the investigation, hearing and determination of such abuse charge as a part of its hearing and determination of the custody [action]." *Id.* § 43-21-151(1)(c). The Supreme Court has held that a chancery court that has previously awarded custody of a child retains jurisdiction to consider a motion to modify custody. *McDonald v. McDonald*, 39 So. 3d 868, 886 (¶56) (Miss. 2010) (citing Miss. Code Ann. § 93-5-23; *Morris v. Morris*, 245 So. 2d 22 (Miss. 1971)). The chancery court's jurisdiction is "limited . . . only 'if there has been a prior proceeding in the youth court concerning that same child.'" *Id.* at 886 (¶58) (emphasis omitted) (quoting *K.M.K. v. S.L.M. ex rel J.H.*, 775 So. 2d 115, 118 (¶10) (Miss. 2000)).

¶37. In the present case, DCPS investigated the alleged abuse, and a forensic interview was conducted, but the matter was never referred to the youth court. In addition, the chancery court had made an initial custody determination just three months prior to the parties' filing of competing complaints for modification of custody. Thus, the chancery court had jurisdiction over the custody action, and the chancellor did not err by addressing the alleged abuse in the course of adjudicating the custody action.

¶38. Kate also argues that the chancellor should have followed the Uniform Rules of Youth Court Practice. Kate is correct that the Youth Court Rules apply to a custody dispute in chancery court in which the court elects to hear and determine an allegation of abuse that arises during the case. U.R.Y.C.P. 2(a)(2). However, Kate references only a few specific Youth Court Rules, and she identifies no way in which she was prejudiced by the

chancellor's alleged failure to follow any of those rules. Given that we reverse on other grounds, this sub-argument requires no further discussion.

## II. Max did not prove a material change in circumstances warranting a modification of custody.

¶39. A chancellor may not grant a modification of custody unless the chancellor finds "(1) that a material change of circumstances has occurred in the custodial home since the most recent custody decree, (2) that the change adversely affects the child, and (3) that modification is in the best interest of the child." *Campbell v. Watts*, 192 So. 3d 317, 318 (¶6) (Miss. Ct. App. 2015) (quoting *Powell v. Powell*, 976 So. 2d 358, 361 (¶11) (Miss. Ct. App. 2008)). The parent seeking a change of custody bears the burden of proving a material, adverse change in circumstances. *Voss v. Doughty*, 242 So. 3d 952, 956 (¶13) (Miss. Ct. App. 2018). "If that burden is met, the chancellor must apply the *Albright* factors to determine whether modification is in the child's best interest." *Id.* (quotation marks omitted). If that burden is not met, "the *Albright* factors need not be addressed." *Id.* at 957 (¶13). In all cases, "there must be a sufficient basis for the chancellor's [modification of custody] in order for this Court to say that the chancellor has not abused his [or her] judicial discretion." *Smith v. Jones*, 654 So. 2d 480, 486 (Miss. 1995).

¶40. Max's complaint alleged that there had been a material change in circumstances because of Kate's false report of child abuse. The chancellor agreed and found that Kate pursued abuse charges against Max "to the detriment of her child, without care, nor attention as to the best interest of her child." The chancellor also found that Kate had tried to replace Max as Danielle's father after she realized that the abuse allegations would not result in a

16

modification of custody. The chancellor found that Kate was not acting in Danielle's best interest when she asked Greene to take a paternity test and that Kate had chosen to harm Danielle emotionally rather than accept that Max had not abused the child. The chancellor found this to be a material change in circumstances and an intentional interference with Max's parental rights.

¶41.    In support of her decision, the chancellor cited *Potter v. Greene*, 973 So. 2d 291 (Miss. Ct. App. 2008).[4] In *Potter*, the mother (Potter) was found in contempt for denying the child's father (Greene) visitation with their daughter. *Potter*, 973 So. 2d at 292 (¶1). Shortly thereafter, Potter accused Greene of sexually abusing the child. *Id.* at 292-93 (¶¶2, 7). The youth court ordered psychological assessments of Potter, Greene, and the child. *Id.* at 292 (¶2). The psychologist concluded that Potter's allegations of abuse were "unfounded" and that Potter had "concocted" the allegations and "had been coaching the child." *Id.* at 292-93 (¶¶3, 7). The chancellor found that Potter's false allegations of sexual abuse "coupled with [her] repeated and deliberate coaching of the child" to falsely accuse Greene had "adversely affected the emotional well being of the . . . child." *Id.* at 293 (¶8). Accordingly, the chancellor found that there had been a material change in circumstances. *Id.* On appeal, this Court affirmed. *Id.* at 293-94 (¶¶7-10). This Court held that the chancellor's factual findings

---

[4] The chancellor also cited *T.K. v. H.K.*, 24 So. 3d 1055 (Miss. Ct. App. 2010). In *T.K.*, the mother falsely alleged that the father had abused her, not the child, and the chancellor mentioned the false allegation in his subsequent decision modifying custody. *Id.* at 1059, 1064-65 (¶¶7, 33-35). However, this Court affirmed the chancellor's decision to transfer custody from the mother to the father because there was compelling evidence that the child had been sexually abused by the mother's boyfriend while in the mother's care, but the mother refused to admit that the abuse had occurred or that there was any problem. *Id.* at 1062-64 (¶¶25-30). Thus, the facts of *T.K.* bear no resemblance to this case.

were supported by sufficient evidence in that both the court-appointed psychologist and the guardian ad litem concluded that the allegations of sexual abuse were "concocted by Potter." *Id.* at 293 (¶7). In addition, we affirmed the chancellor's modification of custody based on Potter's false allegations of sexual abuse "coupled with [her] repeated and deliberate coaching of the child." *Id.* at 293-94 (¶¶8-10).

¶42. This case is distinguishable from *Potter* in critical respects. Although the chancellor ultimately found that no abuse occurred, there is no evidence that Kate "concocted" the allegation out of whole cloth, nor is there any evidence that Kate "coached" Danielle to make false allegations against Max. Rather, the evidence shows that Danielle initially disclosed to Kate that Max had abused her. Kate testified that she had reported the abuse to law enforcement and DCPS because she "ha[d] no reason not to believe [Danielle]." Consistent with Kate's testimony, the record reveals no obvious or apparent reason that Danielle would have made a false allegation of abuse against Max. In addition, Danielle repeated her allegation of abuse during her forensic interview. And although the forensic interviewer (Bixler) opined that Danielle had not been abused, she also testified that Danielle's responses to questions during the interview were consistent with a child who may have been physically abused. Moreover, the DCPS child-family protection specialist (Ashford) believed that Danielle had been abused based on the consistency of Danielle's disclosures of abuse.

¶43. Although the chancellor found that Kate's allegations were made "absent any rational evidence" of abuse, the record does not support this conclusion. While Max denied any abuse and some witnesses agreed that the injuries suffered by Danielle were unlikely to be

18

the result of abuse, it is clear that Danielle told her mother that Max had abused her and that Danielle again disclosed abuse during her forensic interview. Kate testified that she believed her daughter because she had no reason not to believe her. Although the chancellor ultimately found that no abuse was proven, the evidence does not show that Kate behaved irrationally by believing her daughter's disclosure.

¶44.   Moreover, there is no evidence that Danielle was adversely affected or suffered any emotional harm because Kate believed and disclosed what Danielle had told her. Even if there has been a material change in circumstances, the chancellor may not modify custody unless the party requesting the modification proves that the change *adversely affects* the child. *Spain v. Holland*, 483 So. 2d 318, 320 (Miss. 1986). "[A] change in custody is a 'jolting, traumatic experience. It is only that behavior of a parent which clearly posits or causes danger to the mental and emotional well-being of a child . . . which is sufficient basis to seriously consider the drastic legal action of changing custody.'" *Lambert v. Lambert*, 872 So. 2d 679, 684 (¶22) (Miss. Ct. App. 2003) (quoting *Ballard v. Ballard*, 434 So. 2d 1357, 1360 (Miss. 1983)). By all accounts, Danielle is a happy, healthy child. There is no evidence that she was emotionally harmed by the experience of repeating her disclosures of abuse to Bixler. Because Max "failed to show that [Danielle's] mental and emotional well-being . . . was in any danger as a result of" the original award of joint custody, the chancellor erred by granting a change of custody on this ground. *Id.* at 685 (¶26).

¶45.   For similar reasons, although the chancellor reasonably questioned Kate's decisions to pursue a paternity test for Greene and introduce Danielle to Greene, there is no evidence

19

that Danielle was negatively affected by the test or the introduction to Greene. Indeed, there is no evidence that Danielle is aware that Greene likely is her father. In the absence of any evidence of an adverse effect on Danielle, the chancellor erred by modifying custody on this ground as well.

¶46. Because Max failed to prove a material change in circumstances that adversely affected Danielle, the order modifying custody must be reversed and rendered. For that reason, it is unnecessary to address Kate's challenges to the chancellor's *Albright* analysis. *See, e.g.*, *Voss*, 242 So. 3d at 957 (¶13) ("[I]f there has been no material, adverse change in circumstances, the *Albright* factors need not be addressed.").

### III. Max was not entitled to an award of attorney's fees.

¶47. Kate argues that the chancellor's award of attorney's fees for Max's defense against the abuse allegations in both civil and criminal proceedings was improper. She argues that the fee award for the abuse allegations was not proper because the charges were substantiated by DCPS, even if they were ultimately deemed to be unproven.

¶48. The chancellor awarded attorney's fees pursuant to Mississippi Code Annotated section 93-5-24(9). Section 93-5-24(9)(a)(i) establishes "a rebuttable presumption that it is detrimental to the child and not in the best interest of the child to be placed in sole custody, joint legal custody or joint physical custody of a parent who has a history of perpetrating family violence." Section 93-5-24(9)(c) then provides:

> If the court finds that the allegations of domestic violence are completely
> unfounded, the chancery court shall order the alleging party to pay all court
> costs and reasonable attorney's fees incurred by the defending party in

20

responding to such allegations.[5]

The chancellor found that Max was entitled to an award of attorneys' fees under this statute because Kate's allegations of abuse were "completely unfounded" and "without a basis in fact."

¶49. However, for the reasons discussed in Part II of this opinion, the record does not support the chancellor's conclusion. As discussed above, there is no dispute that Danielle disclosed abuse both to Kate and again in her forensic interview. In addition, there is no evidence or even suggestion that Kate coached Danielle to make a false allegation. Kate testified that she believed Danielle because she had no reason not to believe her, and nothing in the record shows that Danielle had any obvious or apparent reason for making a false allegation. Furthermore, the DCPS child-family protection specialist (Ashford) testified that she also believed that Danielle had been abused based on the consistency of Danielle's disclosures of abuse. Indeed, Ashford testified that she "substantiated" the allegation of abuse. Finally, even though the forensic interviewer (Bixler) ultimately concluded that Danielle had not been abused, even she stated that Danielle's responses to interview questions were consistent with a child who had been abused. Under these circumstances, it cannot be said that Kate's allegation of abuse was "completely unfounded." Therefore, the chancellor's award of attorney's fees must be reversed and rendered.

---

[5] *See also* Miss. Code Ann. § 93-5-23 (Rev. 2018) ("If after investigation by [DCPS] or final disposition by the youth court or family court allegations of child abuse are found to be without foundation, the chancery court shall order the alleging party to pay all court costs and reasonable attorney's fees incurred by the defending party in responding to such allegation.").

21

## CONCLUSION

¶50.   We reverse and render the modification of custody because Max failed to prove a material, adverse change in circumstances.  We affirm the judgment of the chancery court insofar as the court denied Kate's request to modify custody.  Therefore, the parties should return to the prior joint custody arrangement as set forth in the original (July 17, 2018) opinion and final judgment of the chancery court.  We also reverse and render the award of attorney's fees to Max.

¶51.   **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR.  McDONALD, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**